WHITMAN CORPORATION *et al.*, Plaintiffs-Appellants, v. COMMERCIAL UNION INSURANCE COMPANY *et al.*, Defendants-Appellees.

First District (2nd Division)    No. 1—00—3954

Opinion filed November 26, 2002.

Lea Leadbeater and Douglas W. Michaud, both of Fogani, Guibord, Homsy & Roberts, of Chicago, for appellants.

David P. Cutler, of Cutler & Hull, of Chicago, for appellee Commercial Union Insurance Company.

Tressler, Soderstrom, Maloney & Priess, of Chicago (David E. Trainor and Brett L. Warning, of counsel), for appellee Michigan Mutual Insurance Company.

John D. Dalton, of Merlo, Kanofsky & Brinkmeier, Ltd., of Chicago, for appellee United States Fire Insurance Company.

PRESIDING JUSTICE McBRIDE delivered the opinion of the court:

Plaintiffs-appellants, Whitman Corporation (Whitman) and Pneumo Abex Corporation (Pneumo Abex) (collectively plaintiffs), appeal from the trial court's dismissal of counts III and IV of plaintiffs' third amended declaratory judgment complaint under section 2—615 of the Illinois Code of Civil Procedure. 735 ILCS 5/2—615 (West 1998). Defendants-appellees are Commercial Union Insurance Company (Commercial Union), Michigan Mutual Insurance Company (Michigan Mutual),[1] and United States Fire Insurance Company (U.S. Fire) (collectively the Insurers). In May of 1993, Pneumo Abex sold certain assets to B.F. Goodrich Company (BFG) in the form of facilities at four separate locations pursuant to an asset purchase agreement. The agreement included indemnification provisions, including special provisions pertaining to environmental liabilities, where the parties agreed

---

[1]Michigan Mutual and U.S. Fire joined Commercial Union's motion to strike and dismiss counts III and IV of plaintiffs' third amended complaint under section 2—615 of the Illinois Code of Civil Procedure. 735 ILCS 5/2—615 (West 1998).

to indemnify each other for certain environmental remediation expenses at the four site locations. On March 12, 1996, Pneumo Abex filed a complaint against BFG alleging that BFG had violated certain indemnity terms in the agreement. In response, BFG filed a counterclaim alleging that Pneumo Abex had breached the agreement by failing to indemnify it for environmental expenses at the site locations.

In plaintiffs' third amended complaint, plaintiffs alleged that the Insurers had an obligation to defend them against the counterclaim filed by BFG under several policies issued to the plaintiffs by the Insurers. According to plaintiffs, the Insurers' failure to defend amounted to a breach of the policies and resulted in defense costs incurred by plaintiffs in the amount of $1,953,186. The Insurers filed a motion to dismiss plaintiffs' third amended complaint for declaratory judgment which was granted by the trial court on October 10, 2000.

The trial court's primary ground for dismissal was that the allegations in the BFG counterclaim arose out of the alleged breach of the asset purchase agreement and did not amount to property damage caused by an "occurrence" as defined in the policies issued by the Insurers. As a result, it found that the allegations in the counterclaim did not fall within or potentially within the policies' coverage for environmental contamination or property damage. The trial court further found that "plaintiffs" failed to precisely allege when the damage, for which BFG sought reimbursement, occurred.

We first review whether the trial court properly granted the Insurers' motion to dismiss on the grounds that the allegations in the BFG counterclaim did not amount to property damage caused by an "occurrence" under the policies and therefore did not fall within or potentially within the policies' coverage. We state the following additional facts.

The Insurers provided primary general liability and umbrella insurance coverage to Cleveland Pneumatic Company through 46 separate policies that were collectively effective from December 1, 1960, to February 1, 1985. The policies contained similar language with regard to coverage. Specifically, the policies stated:

> "The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of *** property damage *** to which this policy applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the Insured seeking damages on account of such *** property damage."

An "occurrence," as defined in the policies, "means an accident, including continuous or repeated exposure to conditions, which results

in bodily injury or property damage neither expected nor intended from the standpoint of the insured."

Cleveland Pneumatic was a subsidiary of Pneumo Dynamics Corporation, which was subsequently named Pneumo Corporation. Cleveland Pneumatic owned or leased and operated several facilities at four sites: two of which were located in Cleveland, Ohio; one in Tullahoma, Tennessee; and one in Miami, Florida. In 1984, Whitman acquired Pneumo Corporation, which remained a wholly owned subsidiary of Whitman until August 28, 1988. Pneumo Abex is a successor to Pneumo Corporation. The record reveals that a stock purchase agreement (SPA) existed as part of the financial relationship between Pneumo Abex and Whitman.

On May 15, 1993, Pneumo Abex sold the Cleveland Pneumatics assets, including the four sites identified above, to BFG pursuant to an asset purchase agreement. The agreement included indemnification provisions, including special provisions pertaining to environmental liabilities, whereby each party agreed to indemnify and hold the other party harmless for certain environmental liabilities. "Environmental Liabilities" were defined in the agreement as:

> "Losses or expenses incurred for response and compliance measures undertaken as a result of Environmental Laws and relating to the ownership of the Purchased Assets or operation of the Purchased Business. 'Environmental Laws' are in turn defined as those laws and ordinances pertaining to the environment as in effect on the closing date of the Agreement."

The agreement further required both parties to acknowledge the SPA between Pneumo Abex and Whitman. As part of the asset purchase agreement, BFG received a copy of the SPA and was to comply with the SPA and the asset purchase agreement's indemnification provisions so that Pneumo Abex could in turn be indemnified by Whitman for certain environmental remediation expenditures.

On March 12, 1996, Pneumo Abex filed a complaint against BFG (Pneumo complaint) alleging that BFG violated certain indemnity terms of the asset purchase agreement. In it, Pneumo Abex claimed that BFG sought indemnification for environmental expenses that were outside the scope of the agreement. Specifically, Pneumo Abex alleged that BFG attempted to shift to Pneumo Abex the obligation to pay for a wide array of expenses associated with environmental activities that BFG had chosen to incur voluntarily and that were beyond the scope of "covered losses" enumerated in the indemnification provisions of the agreement.

Further, according to Pneumo Abex, BFG failed to notify it of environmental claims with reasonable promptness and specificity as

required under section 13.5 of the asset purchase agreement. In particular, section 13.5 of the agreement, which governed indemnification between the parties for certain environmental liabilities, required that either party, upon becoming aware of any environmental claim, was to notify the other party with reasonable promptness and reasonable specificity.

Pneumo Abex claimed that, in 1994, it began receiving communications from BFG vaguely describing various environmental conditions discovered at the Miami, Tullahoma, and Cleveland facilities. Beyond these vague communications, Pneumo Abex alleged that BFG failed to provide reasonable advance notice or an opportunity to monitor and/or consult on all proposed actions and failed to provide reasonable specificity of its claims in violation of the agreement. Specifically, Pneumo Abex alleged that BFG: (1) failed to provide it with proposed work plans, draft reports, consultant correspondence, or work schedules so that field and sampling activities could be monitored by Pneumo Abex; (2) failed to advise or consult with Pneumo Abex concerning the anticipated selection of possible consultants; (3) withheld consultants' invoices and other invoices related to the claimed activities, risk assessment reports, data, and results of other remediation studies; and (4) supplied Pneumo Abex with information that was inconsistent and outdated.

The Pneumo complaint alleged that BFG sent Pneumo Abex letters on August 25, 1994, and October 27, 1994. The August 25, 1994, letter concerned a situation at the Miami facility regarding environmental permits but stated that the letter was "preliminary to any formal notification" for indemnification under the agreement. The October 27, 1994, letter contained a summary of the results of BFG's environmental reviews at the Cleveland and Tullahoma facilities for which BFG sought costs to be shared under the agreement. However, Pneumo Abex alleged that the letter failed to explain the basis for BFG's belief that these remedial procedures were indemnifiable claims under the agreement.

The Pneumo complaint further alleged that Pneumo Abex requested in writing that BFG provide information relating to matters on which BFG sought indemnity. It informed BFG that, under the agreement, BFG could not pursue indemnification claims where advance notice had not been provided to Pneumo Abex. The Pneumo complaint claimed that, in response, BFG failed to provide Pneumo Abex with the required information, and furnished only limited information, all of which was provided months after the activities had been completed. According to Pneumo Abex, BFG's deliberate violation of the agreement prejudiced Pneumo Abex by, among other things,

"precluding Pneumo Abex from monitoring BFG's activities and/or from consulting with respect to actions taken." In a letter dated February 1, 1995, Pneumo Abex reiterated its concerns that BFG had disregarded the indemnification procedures outlined in the agreement and specifically requested that BFG specify any indemnification claims under the agreement. Four months later, BFG responded with a letter notifying Pneumo Abex of an alleged obligation to indemnify BFG for all investigative work performed to date and for all identified contamination, regardless of the cause or source or legal obligation. Pneumo Abex responded with two letters communicating that it could not acknowledge or disclaim any indemnification obligations without being supplied with the information contemplated by the agreement. On November 3, 1995, BFG responded stating that it had supplied sufficient information necessary to satisfy the terms of the agreement. In response to another letter from Pneumo Abex requiring more information, BFG sent a letter demanding payment in the amount of $130,349.65.

Also in the Pneumo complaint, Pneumo Abex claimed that BFG's actions threatened its ability to seek indemnification from Whitman under the SPA. Section 13.5(f) of the agreement provided, in pertinent part: "Buyer and Seller at all times shall use their reasonable best efforts to comply with the procedures of the SPA and to reasonably cooperate with each other in obtaining the benefit of any Whitman obligations under the SPA."

On the above grounds, the Pneumo complaint sought five forms of relief: (1) a declaration that the agreement between Pneumo Abex and BFG was a valid and existing contract, that Pneumo Abex had performed all of its existing obligations under the agreement, that an actual dispute existed as to whether BFG had failed to fulfill its obligations under the indemnification provisions under the agreement, and that as a result of BFG's breach, it had no obligations under the agreement to indemnify BFG for any money it sought in connection with environmental liability; (2) a declaration that an actual dispute existed as to whether Pneumo Abex had an obligation to indemnify BFG until BFG fulfilled its obligations under the agreement and a determination whether such environmental liabilities were covered by the agreement; (3) a declaration that BFG materially breached the asset purchase agreement; (4) a declaration of repudiation of the asset purchase agreement; and (5) a declaration that BFG breached the covenant of good faith and fair dealing by failing to notify Pneumo Abex with reasonable promptness and reasonable specificity of indemnification claims under the agreement.

On April 1, 1996, BFG filed a counterclaim against Pneumo Abex.

The parties agree that the allegations of the counterclaim are the sole grounds upon which the duty to defend could arise in this case. BFG's counterclaim stated that Pneumo Abex agreed to indemnify and hold BFG harmless under section 13.5(b) of the asset purchase agreement. It also alleged that, under section 13.5(e) of the agreement, the parties would each bear 50% of the environmental liabilities until the total amount of those liabilities reached $14 million. BFG further claimed that, based upon environmental investigations conducted at all four sites, contamination had occurred which exceeded human health and environmental protection standards. It stated that these conditions were attributable to events that occurred prior to BFG's current "stewardship" of the facilities. BFG argued that its expenditures all constituted environmental liabilities for which Pneumo Abex had agreed to indemnify it under section 13.5 of the asset purchase agreement. The counterclaim further alleged that BFG had complied with all conditions of section 13.5 and that it had properly and timely notified Pneumo Abex of the environmental conditions at the four sites and of BFG's costs incurred in connection with remediating those conditions.

For its relief in the counterclaim, BFG sought a declaration that the agreement constituted a valid and existing contract between it and Pneumo Abex and also that BFG and Pneumo Abex had an actual dispute over whether Pneumo Abex had an obligation under the agreement to indemnify BFG for costs "it [had] incurred to date, [and expected] to incur in the future, in connection with Environmental Liabilities, in accordance with the indemnity provisions of the Agreement." BFG also sought a declaration that BFG had fulfilled its obligations under the agreement, that Pneumo Abex had failed to fulfill its obligations under the indemnification provisions of the agreement, and that Pneumo Abex's failure to fulfill its obligations under the agreement constituted a material breach of contract with regard to environmental liabilities incurred by BFG. BFG also sought a declaration that Pneumo Abex's action constituted a wrongful repudiation of its obligations under the agreement with regard to environmental liabilities incurred by BFG. Finally, BFG sought a declaration that Pneumo Abex breached the covenants of good faith and fair dealing by failing to cooperate with BFG in the performance of actions in response to known environmental liabilities and by refusing to remit payments to BFG as requested, for costs incurred, to address environmental liabilities.

In plaintiffs' third amended complaint (the subject of this appeal), plaintiffs alleged that the Insurers had an indivisible obligation to defend or indemnify them against the counterclaim filed by BFG and

that the failure to defend or indemnify them amounted to a breach of the policies issued by the Insurers. Specifically, plaintiffs alleged that the policies provided coverage on behalf of the insureds for "all sums which the insured[s] shall become legally obligated to pay as damages because of *** property damage *** caused by an occurrence." In paragraph 36 of the complaint, plaintiffs alleged that they had received "claims and demands alleging damages because of property damage" at the four sites at issue. Further, paragraph 36 stated, "the property damage [at issue] *** is allegedly continuous and progressive beginning before 1961 and continuing to 1986 or thereafter." Because of the Insurers' refusal to defend the BFG counterclaim, plaintiffs alleged that they incurred defense costs of $1,953,186. The record reveals that the BFG suit was resolved by settlement whereby plaintiffs were ordered to pay BFG $1 million.

In an order entered October 10, 2000, the trial court granted the Insurers' motion to dismiss plaintiffs' third amended complaint for declaratory judgment. The trial court concluded that the allegations in the BFG counterclaim arose out of an alleged breach of the asset purchase agreement and did not amount to an "occurrence" as defined in the policies. Therefore, the trial court found the allegations in the underlying complaint did not fall within or potentially within the policies' coverage for environmental contamination or property damage.

The trial court further found that the BFG counterclaim did not precisely allege when the damage, for which BFG sought reimbursement under the asset purchase agreement, occurred. Since the policies expired eight years before the asset purchase agreement was executed, the trial court concluded that it was impossible to determine on the face of the pleadings whether the policies would have been in effect when the alleged environmental damage occurred. In another order entered October 19, 2000, the trial court confirmed the dismissal order of October 10, 2000, and made a written finding under Supreme Court Rule 304(a). 155 Ill. 2d R. 304(a). Plaintiffs now appeal.

We first address whether the trial court correctly granted the Insurers' motion to dismiss on the ground that the allegations in the BFG counterclaim did not constitute an occurrence under the policies and, thus, did not fall within or potentially within the policies' coverage. This court reviews a trial court's ruling upon a motion to dismiss *de novo*. *Royal Insurance Co. of America v. Insignia Financial Group, Inc.*, 323 Ill. App. 3d 58, 63, 751 N.E.2d 164 (2001); *Stokes v. Pekin Insurance Co.*, 298 Ill. App. 3d 278, 280, 698 N.E.2d 252 (1998).

■ It is well settled in Illinois:

"To determine whether the insurer has a duty to defend the insured, the court must look to the allegations in the underlying

complaint and compare these allegations to the relevant provisions of the insurance policy. [Citations.] If the facts alleged in the underlying complaint fall within, or potentially within, the policy's coverage, the insurer's duty to defend arises. [Citations.] Refusal to defend is unjustifiable unless it is clear from the face of the underlying complaint that the facts alleged do not fall potentially within the policy's coverage." *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 107-08, 607 N.E.2d 1204 (1992).

Plaintiffs contend that the allegations in the counterclaim fall within the policies' coverage. In support of their argument, they primarily rely upon paragraphs 79 through 85 of the counterclaim filed by BFG. These paragraphs alleged the following:

"79. Environmental investigations performed on behalf of BFG confirm that a wide-range of 'Hazardous Substances,' as that term is defined by the [Asset Purchase] Agreement, have been identified at levels exceeding those allowable under human health and environmental protection standards in soils and groundwater at the facilities formerly operated by Pneumo Abex and transferred to BFG.

80. Environmental investigations conducted at the Cleveland New Main facility establish that the soils and groundwater in and around the facility are contaminated with volatile organic compounds, solvents, heavy metals, and total petroleum hydrocarbons at levels exceeding human health and environmental protection standards established under 'Environmental Laws,' as that term is defined in the Agreement.

81. The contamination at the Cleveland New Main facility, if left unremediated, threatens the quality of site groundwater, the safety of workers and others that may become involved in site operation, construction or maintenance activities, and soils and groundwater at neighboring properties, including residences. These conditions are attributable to events and activities that occurred prior to Plaintiff's current stewardship of the facility.

82. Environmental investigations conducted at the Cleveland Plating facility establish that the soils and groundwater at the facility are contaminated with chlorinate organic contaminants and petroleum at levels exceeding human health and environmental protection standards established under 'Environmental Laws,' as that term is defined in the Agreement.

83. The contamination at the Cleveland Plating facility, if left unremediated, presents a substantial risk for off-site migration, and thus threatens the soils and groundwater at neighboring properties. These conditions are attributable to events and activities that occurred prior to BFG's current stewardship of the facility.

84. Environmental investigations conducted at the Tullahoma

facility establish that the soils and subsurface areas of the facility are contaminated with volatile organic compounds, heavy metals and total petroleum hydrocarbons at levels exceeding human health and environmental protection standards established under 'Environmental Laws,' as that term is defined in the Agreement.

85. The contamination at the Tullahoma facility, if left unremediated, threatens the quality of groundwater and presents a substantial risk for migration to off-site properties. These conditions are attributable to events and activities that occurred prior to BFG's current stewardship of the property."

■ In order to find a duty to defend, we would have to conclude that the above allegations, along with any other in the counterclaim, fall within or potentially within the subject policies' coverage. As noted above, the instant policies provided that: " 'occurrence' means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." An accident has been interpreted to mean " 'an unforeseen occurrence *** of untoward or disastrous character' or 'an undesigned sudden or unexpected event.' " *Bituminous Casualty Corp. v. Gust K. Newberg Construction Co.*, 218 Ill. App. 3d 956, 965-66, 578 N.E.2d 1003 (1991), quoting *Aetna Casualty & Surety Co. v. Freyer*, 89 Ill. App. 3d 617, 619 (1980). Our review therefore requires us to compare the allegations of the complaint with the policies and determine whether the allegations of the counterclaim allege or potentially allege an "occurrence" as that term is defined in the policy.

We now compare the allegations of the counterclaim and the relevant policy provisions. Paragraph 71 of the counterclaim states that "BFG's counterclaims arise out of the transactions or occurrences, relating to the parties' actions and obligations to each other under the Agreement with respect to covered environmental matters, which are the subject matter of [Pneumo Abex's] complaint ***." In paragraph 72 of the counterclaim, BFG sought a declaration of Pneumo Abex's obligation to reimburse BFG for environmental remediation expenses provided for under "the Agreement." In paragraph 74 of the counterclaim, BFG claimed that Pnuemo Abex agreed to indemnify it for environmental liabilities relating to purchased assets or business under the agreement.

Paragraph 79 indicated that "Hazardous Substances," as defined in the agreement, had been identified at the various sites owned by BFG. Paragraphs 80, 82, and 84 indicated the presence of contamination at the Cleveland New Main, Cleveland Plating, and Tullahoma facilities exceeding human health and environmental protection

standards established under "Environmental Laws," as that term was defined in the agreement. Paragraphs 81, 83, and 85 alleged that the contamination, if left unremediated, threatened human health and environmental concerns. Those same paragraphs also alleged that the contamination occurred before BFG maintained "stewardship" over the property.

Paragraph 86 alleged:

"To date, BFG has incurred over $400,000 to identify and characterize the presence at the properties of 'Hazardous Substances' within the meaning of the Agreement, at or above levels of regulatory concern, to evaluate the risks posed by those substances to site occupants, ground water resources and neighboring properties, and to implement appropriate response actions."

Paragraph 88 further provided:

"These expenditures all constitute 'Environmental Liabilities' for which Pneumo Abex has agreed to indemnify BFG under the terms of Article 13.5 of the Agreement."

Considering all of the allegations above, we do not find that they alleged "an accident, including continuous or repeated exposure to conditions, which [resulted] in bodily injury or property damage neither expected nor intended from the standpoint of the insured." We also find that the counterclaim did not seek relief for property damage. Instead, the counterclaim sought indemnification for *expenses* incurred for remediating the environmental contamination contemplated by the parties in the asset purchase agreement. Because the contamination and the expenses for remediating the contamination were contemplated by the parties, the damages complained of could not have arisen from an unforeseen occurrence.

On appeal, plaintiffs rely primarily upon *Outboard Marine*, 154 Ill. 2d at 111, and *United States Fidelity & Guaranty Co. v. Specialty Coatings Co.*, 180 Ill. App. 3d 378, 382, 535 N.E.2d 1071 (1989). They state that broad insuring language in *Outboard Marine* and *Specialty Coatings* is similar if not identical to the policy language in this case. Plaintiffs also suggest that the allegations of environmental property damage caused by the insured in the BFG suit are similar to the allegations in the third-party actions in *Outboard Marine* and *Specialty Coatings*. Because the third-party actions in those cases triggered the duty to defend, plaintiffs claim that the BFG suit triggered the duty to defend in this case.

In *Outboard Marine*, several complaints were filed against Outboard Marine Corporation (OMC) by the state and federal environmental protection agencies for the discharge of polychlorinated biphenyls into the North Ditch, Waukegan Harbor, and Lake Michigan.

The underlying suits also included a third-party complaint filed by OMC against the Monsanto Corporation. The Environmental Protection Agency (EPA) then joined Monsanto as a party defendant in an amended complaint. Monsanto filed a cross-claim for indemnification against OMC in the event it was found liable as a result of the EPA action. OMC tendered the defense of the underlying actions to its insurers under comprehensive general liability insurance policies. The policy language stated:

> " '[The insurer] will pay on behalf of the insured all sums which the insured shall become obligated to pay as damages because of *** property damage to which this policy applies, caused by an occurrence, and the company shall have the right and duty to defend any suits against the insured seeking damages on account of such property damage ***.' " *Outboard Marine*, 154 Ill. 2d at 109.

The question presented in *Outboard Marine* was whether the underlying actions, which sought primarily equitable relief, fell potentially within the coverage afforded by the insurer's commercial general liability policies for "suits seeking damages," thereby triggering the insurer's duty to defend OMC. The supreme court reasoned that a comprehensive general liability insurance policy is a very broad policy where the insurer assumes a wide scope of risks. It found that the insurer in that case intended to offer and OMC intended to purchase comprehensive protection against liability for property damage caused by an occurrence, and concluded that the underlying actions were "suits seeking damages" which triggered the insurer's duty to defend. *Outboard Marine*, 154 Ill. 2d at 117.

*Outboard Marine* is distinguishable from the instant case. First, the underlying actions in *Outboard Marine* were filed by state and federal environmental protection agencies against OMC for environmental contamination. In this case, the underlying action arose from the alleged breach of the asset purchase agreement between the parties. Thus, the Pneumo complaint here does not involve an action for environmental pollution. Instead, the suit from which plaintiffs seek relief is the counterclaim filed by BFG concerning Pneumo Abex's alleged failure to comply with the agreement's indemnification provisions. Such a claim did not exist in *Outboard Marine*.

Second, the third-party complaint and cross-claim in *Outboard Marine* sought indemnification or contribution from the respective contaminators in the event of liability incurred as a result of the action from the environmental protection agencies. Here, the Pneumo complaint and BFG counterclaim sought declaratory relief that the breaching party failed to fulfill its respective obligations under the asset purchase agreement.

*Specialty Coatings* is also distinguishable. In *Specialty Coatings*, Unites States Fidelity and Guaranty Co. (USF&G) issued the defendants-insureds, who were producers of industrial coatings, sealants, and adhesives, comprehensive general liability policies. The defendants tendered to USF&G the defense of two separate claims for environmental damage. The first was filed by the state for the alleged delivery and disposal of industrial wastes in Kankakee County. The second action was a potentially responsible party (PRP) letter issued from the United States Environmental Protection Agency. A third-party action was also filed against the defendants for contribution in connection with the defendants' disposal of hazardous wastes at a certain site.

The relevant issue decided was whether the PRP letter triggered USF&G's duty to defend. The appellate court found that the duty to defend was triggered because the PRP letter amounted to a suit and the concomitant duty to defend. *Specialty Coatings*, 180 Ill. App. 3d at 389.

*Specialty Coatings* is distinguishable because the underlying allegations in that case involved direct action by environmental agencies for alleged pollution by the defendants. The third-party claim was directly related to contribution for potential expenses incurred by another defendant named in the action taken by the environmental agencies. In *Specialty Coatings*, no asset purchase agreement with indemnification provisions existed between the parties.

Although we find *Specialty Coatings* distinguishable, there is language in that decision which supports our conclusion in this case. In *Specialty Coatings*, the court found that, "where the genesis of the relief sought is 'physical injury to tangible property' or 'loss of use of tangible property,' the claim seeks relief from 'property damage' as defined by the contract. [Citations.]" *Specialty Coatings*, 180 Ill. App. 3d at 393-94. In the instant case, the genesis for the relief sought was not for "physical injury to tangible property" or "loss of use of tangible property" but, rather, for monies owed as a result of a breach of the indemnification agreement.

Plaintiffs also rely upon the Supreme Court of California's decision in *Vandenberg v. Superior Court*, 21 Cal. 4th 815, 982 P.2d 229, 88 Cal. Rptr. 2d 366 (1999). In *Vandenberg*, the plaintiff leased a parcel of land from Eugene and Katherine Boyd (collectively the Boyds) for the purpose of selling and servicing automobiles. In 1988, plaintiff discontinued the business and possession of the land reverted to the Boyds. Testing of the property revealed contamination of soils and groundwater on the property as the result of three underground waste oil storage tanks installed by the plaintiff. The Boyds filed a complaint

against the plaintiff for several causes of action including waste, nuisance, and breach of the lease agreement.

The plaintiff held commercial general liability insurance from several insurers. The policies provided coverage for sums the plaintiff was "legally obligated to pay as damages" for property damage. *Vandenberg*, 21 Cal. 4th at 825, 982 P.2d at 235, 88 Cal. Rptr. 2d at 372. The plaintiff tendered the defense of the Boyd complaint to his insurers and only USF&G agreed to defend. The parties reached a settlement, and it was agreed between the Boyds and the plaintiff that the breach of lease issues would be resolved through arbitration. USF&G agreed to defend the plaintiff in the arbitration, but reserved its coverage and indemnity obligations for future resolution.

In the arbitration, the arbitrator ruled for the Boyds in the amount of $4 million. The award was confirmed by a superior court judgment and the plaintiff requested indemnification from his insurers. The insurers rejected the plaintiff's indemnification request and the plaintiff then filed the underlying action against his insurers alleging a failure to defend, settle, or indemnify in the Boyd action. In a motion, the insurers sought summary judgment on the ground that the arbitrator awarded damages for breach of lease, a contractual cause of action, and contractual damages were not covered by the commercial general liability policies at issue. The trial court found that the plaintiff had no coverage under the policies for the arbitration award because the claims submitted to the arbitrator were contractual. *Vandenberg*, 21 Cal. 4th at 827, 982 P.2d at 236, 88 Cal. Rptr. 2d at 373.

The court of appeals reversed, ruling that "coverage under the insurance policies in question could not be determined by reference to the 'general rule' that damages for an insured's nonperformance of a contract are not covered under CGL insurance polices." *Vandenberg*, 21 Cal. 4th at 827, 982 P.2d at 236, 88 Cal. Rptr. 2d at 374. The court further reasoned that, "when there is damage to property, the focus of the inquiry should be the nature of the risk or peril that caused the injury and the specific policy language, not the form of the action brought by the injured party." *Vandenberg*, 21 Cal. 4th at 828, 982 P.2d at 246, 99 Cal. Rptr. 2d at 374. The supreme court affirmed the reasoning of the court of appeals. *Vandenberg*, 21 Cal. 4th at 841, 982 P.2d at 246, 88 Cal. Rptr. 2d at 384-85.

In our view, *Vandenberg* is distinguishable. First, in *Vandenberg*, a breach of contract theory was asserted against the plaintiff in the action filed by the Boyds in addition to claims for environmental damages. In the instant case, the Pneumo complaint and BFG counterclaim sought damages for breach of the asset purchase agreement and for the alleged failure to comply with the agreement's indemnification

provisions. Thus, the Pneumo action and BFG counterclaim amounted only to a breach of contract, which is unlike the breach of lease and environmental claims brought against the plaintiff in *Vandenberg*. Furthermore, we are not bound by this decision.

We find that *Indiana Insurance Co. v. Hydra Corp.*, 245 Ill. App. 3d 926, 615 N.E.2d 70 (1993), and *Bituminous*, 218 Ill. App. 3d at 966, are instructive in this case. In *Hydra*, Hydra Corporation (Hydra) contracted to construct a building for B.K. Production Specialties (B.K.). The contract provided for arbitration in the event of a dispute. When numerous cracks emerged in the building's concrete floor and the building developed an unsightly appearance due to loose paint, B.K. initiated an arbitration proceeding for repairs at Hydra's expense. The arbitrator ruled in favor of B.K., yet Hydra did not make the repairs. B.K. then filed a complaint seeking enforcement of the arbitration award. Hydra tendered the complaint to its insurer, Indiana Insurance Company, for a defense and indemnity.

The language in two policies Indiana issued to Hydra stated the following:

" 'The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of

Coverage A. bodily injury or

Coverage B. property damage to which this insurance applies caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage ***.' " *Hydra*, 245 Ill. App. 3d at 928.

Indiana filed a declaratory judgment seeking a declaration that it need not defend or indemnify Hydra because the damages suffered by B.K. were not caused by an occurrence. The trial court entered a motion for judgment on the pleadings in favor of Indiana.

On review, the appellate court affirmed the trial court on the ground that the underlying complaint did not allege damages resulting from an unforeseen occurrence as required by the policies. Instead, it reasoned that the cracks in the floor and the loose paint on the building's exterior were the natural and ordinary consequences of installing defective concrete and applying the wrong type of paint, bases for a breach of contract claim. Thus, the court determined that B.K.'s breach of contract claim was not covered under the policies issued by Indiana. *Hydra*, 245 Ill. App. 3d at 932.

In *Bituminous*, the defendants-insureds were sued by the State of Illinois for various acts and omissions related to the design, manufacture, and installation of the heating, ventilating, and air conditioning

system (HVAC) in the State of Illinois Building. The defendants tendered the claims to their insurance company, Bituminous Casualty. The policy provided that the insurer would defend any suit seeking damage against the insured for property damage, which was defined in the policy as loss of the use of tangible property caused by an occurrence.

Bituminous filed a declaratory judgment action which sought a determination that it had no duty to defend or indemnify on the grounds that the complaint alleged a breach of contract and that a comprehensive general liability policy was not intended to pay the costs for repairing or replacing the insured's defective work and products. The trial court found in favor of Bituminous and granted its motion for summary judgment.

On review, the appellate court concluded that the State's complaint did not allege a loss of use of tangible property caused by an occurrence and affirmed the trial court. *Bituminous*, 218 Ill. App. 3d at 966.

■ In our view, the instant case is analogous to the facts in *Hydra* and *Bituminous*. Upon *de novo* review of the paragraphs relied upon by plaintiffs in the counterclaim, we conclude that the allegations concern a breach of the asset purchase agreement, and do not amount to claims for environmental property damage caused by an "occurrence" as required under the policies at issue. Here, the Pneumo complaint and the counterclaim solely concern whether monies are owed for the breach of the asset purchase agreement between the parties. Significantly, the first paragraph of the Pneumo complaint characterizes the nature of the action as "an action by Pneumo Abex for declaratory and other relief arising out of a breach of a written contract." Further, the "WHEREFORE" clause of the same pleading first seeks a declaration that "BFG has failed to fulfill its obligations under the [asset purchase] Agreement." A review of the counterclaim reveals that it too concerns the parties' obligations arising out of the asset purchase agreement. The mere mention of the words "hazardous substances" or "contamination" in the counterclaim does not establish that "those conditions" on the properties were the result of an "occurrence."

The language of the policies in the instant case is identical to the policy in *Hydra* where the Insurers were legally obligated to pay damages because of property damage caused by an occurrence. As we noted above, an occurrence means an accident under the instant policies and an accident has been defined as " 'an unforeseen occurrence *** of untoward or disastrous character' or 'an undesigned sudden or unexpected event.' " *Bituminous*, 218 Ill. App. 3d at 965-66, quoting *Aetna Casualty*, 89 Ill. App. 3d at 619. Here, the underlying complaint

reveals that the asset purchase agreement concerns indemnity provisions pertaining to environmental liabilities. We do not find that the environmental liabilities referred to in BFG's counterclaim arose from an unforeseen occurrence because the primary purpose of the asset purchase agreement was to provide indemnification for their remediation. Therefore, we conclude that the trial court correctly ruled that the money damages sought were not for property damage and were not a result of an "occurrence" but, rather, were the result of a breach of the asset purchase agreement.

For the reasons above, we conclude that the trial court correctly held the allegations in the counterclaim did not amount to property damages caused by an occurrence. As a result, the allegations did not fall within or potentially within the policies' coverage, and the Insurers' motion to dismiss was properly granted.

Because of our finding on the first issue, we need not address the second issue in this case. For the reasons above, the judgment of the trial court is affirmed.

Affirmed.

CERDA and BURKE, JJ., concur.