831 N.E.2d 1 (2005)
358 Ill. App.3d 34
294 Ill.Dec. 478
VIKING CONSTRUCTION MANAGEMENT, INC. and Continental Casualty Company, Plaintiffs-Appellees,
v.
LIBERTY MUTUAL INSURANCE COMPANY, Defendant-Appellant.
No. 1-03-3152.
Appellate Court of Illinois, First District, Second Division.
May 24, 2005.
Belgrade and O'Donnell, P.C. (Steven B. Belgrade, John A. O'Donnell, George M. *2 Velcich, of counsel), Chicago, for Appellant.
Fisher, Kanaris, P.C. (Jon B. Masini, Scott A. Ruksakiati, of counsel), Chicago, for Appellees.
Presiding Justice BURKE delivered the opinion of the court:
Defendant Liberty Mutual Insurance Company (Liberty Mutual) appeals from an order of the circuit court entering summary judgment in favor of Viking Construction Management, Inc. (Viking)[1] in Viking's declaratory judgment action, declaring that Liberty Mutual owed a duty to defend and indemnify Viking in an underlying lawsuit filed by the Woodland Community School District (Woodland). On appeal, Liberty Mutual contends that the trial court erred in granting summary judgment in favor of Viking because: (1) a breach of contract claim, such as Woodland's, is not covered by its insurance policy; (2) the Woodland complaint failed to allege an "occurrence" covered under the policy; (3) the "your work" policy exclusion bars coverage; (4) Liberty Mutual is not barred, under the estoppel doctrine, from asserting coverage and defense issues; and (5) Liberty Mutual had no duty to indemnify Viking because its policy limits had been exhausted. For the reasons set forth below, we reverse.

STATEMENT OF FACTS
On June 8, 1995, Woodland contracted with Viking to provide construction management services with respect to the design and construction of a new middle school. Pursuant to this agreement, Viking was responsible for, inter alia, determining whether construction was proceeding in accordance with contract documents, guarding Woodland against defects and deficiencies in work, managing the quality program, apprising Woodland of practices that were potentially libelous to Woodland due to safety or other concerns, noting all activities of an unusual or significant nature, reporting to Woodland if it observed activities or situations that were unsafe, and observing the quality of work.
On January 26, 1996, Woodland retained Frederick Quinn as the general contractor, who was required to procure a commercial general liability (CGL) insurance policy naming Viking as an additional insured. Quinn did so through Nationwide Insurance Company (Nationwide). On March 26, Quinn hired Crouch-Walker as the masonry subcontractor. Pursuant to their contract, Crouch-Walker was required to obtain insurance, naming Viking as an additional insured. In this regard, Crouch-Walker obtained a CGL policy in the amount of $1 million from Liberty Mutual as well as an excess policy in the amount of $10 million. Viking was named as an additional insured under both.
The CGL policy contained the following general coverage provision:
"SECTION ICOVERAGES
* * *
a. We will pay those sums that the insured becomes legally obligated to pay as damages because of `bodily injury' or `property damage' to which this insurance applies.
* * *
(2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements *3 under Coverages A or B or medical expenses under Coverage C."
The policy applied to "property damage" only if it was "caused by an `occurrence.'" Section I also set forth numerous exclusions. However, with the exception of exclusion (a),[2] the exclusions were not applicable to additional insureds, like Viking, pursuant to an endorsement attached to the policy and discussed below.
Section II of the policy defines "WHO IS AN INSURED" and was amended by several endorsements. One, entitled "Additional Insured-Owners, Lessees or Contractors (Form A)," under which Viking was added as an additional insured, provides:
"WHO IS AN INSURED (Section II) is amended to include as an insured the person or organization (called `additional insured') shown in the Schedule but only with respect to liability arising out of:
A. Your ongoing operations performed for the additional insured(s) at the location designated above; or
B. Acts or omissions of the additional insured(s) in connection with their general supervision of such operations."
This endorsement provided that exclusions (b), (j), (k), (l), and (n) under Section I, Coverages, did not apply to the additional insureds. However, this endorsement included several exclusions relative to additional insureds, none of which are relevant here. Section V defined various terms used in the policy. "Occurrence" "means an accident, including continuous or repeated exposure to substantially the same general harmful conditions." "Property damage" means "[p]hysical injury to tangible property, including all resulting loss of use of that property."
On October 10, 1996, during the course of construction, portions of a masonry wall collapsed due to inadequate temporary bracing, installed by Crouch-Walker, causing property damage and injuring one of the construction workers. On October 6, 1997, the construction worker, Anita Kratz, filed a personal injury lawsuit against Woodland, Viking, Quinn, and Crouch-Walker (Kratz lawsuit). On August 14, 1998, Woodland filed a lawsuit against Viking (Woodland lawsuit) claiming damages for the repair and replacement of damaged property as a result of the wall collapse. Specifically, Woodland alleged, in its general allegations, that "On October 11, 1996, the north portion of the `E' section of the Woodland Middle School Project collapsed under normal, foreseeable, and expected conditions due to a lack of required bracing and/or construction defects." Woodland then alleged, "[a]s a result of the aforementioned collapse, plaintiff sustained damages * * *, representing the fair and reasonable cost to repair and replace the damaged section of the building." Woodland then set forth count I, the sole count of its complaint, for breach of contract, identifying the following ways in which Viking breached its duties under the contract: failing to warn Woodland of the potential collapse of the wall; failing to warn of the improper bracing; failing to inform Woodland that the construction of section E was not proceeding in compliance with the contract documents; failing to report unsafe conditions; failing to inform of acts or construction practices libelous to Woodland due to safety concerns; and failing to perform its services in a workmanlike manner. Woodland then alleged, "[a]s a direct, proximate and foreseeable result of defendant Viking's breach of contract, plaintiff sustained damages, *4 including, without limitation, the cost to repair and replace the damaged portion of the subject middle school building."
On February 10, 1999, Viking tendered defense of the Kratz litigation to Liberty Mutual, which it accepted. On March 3, Viking tendered defense of the Woodland litigation to Liberty Mutual. In July, Viking tendered defense of the Woodland litigation to Nationwide under Quinn's policy. On July 12, Liberty Mutual denied tender of the defense and coverage to Viking in the Woodland lawsuit and, on December 2, Nationwide did the same. On December 7, Kratz settled her lawsuit with Liberty Mutual on behalf of Viking and Crouch-Walker for $966,409.56. On December 13, Viking and its insurance carrier settled the Woodland lawsuit for $600,000.
On October 10, 2000, Viking filed a 13-count declaratory action against Liberty Mutual, Nationwide, and Quinn, with counts I to IV being against Liberty Mutual. In count I, Viking alleged that Liberty Mutual owed it a duty to defend because the Woodland lawsuit sought property damages as a result of the wall collapse. In count II, Viking alleged that Liberty Mutual owed Viking a duty to indemnify. In count III, Viking alleged a cause of action for unjust enrichment and, in count IV, alleged a claims of equitable estoppel against Liberty Mutual. Viking's claims against Liberty Mutual were premised upon the CGL policy only.
On April 13, 2001, Nationwide filed a cross-claim against Quinn and Liberty Mutual and then, on August 23, it filed a motion for summary judgment. On December 21, Viking filed a motion for summary judgment against Liberty Mutual.
On April 8, 2002, Liberty Mutual filed its response to Viking's motion for summary judgment, arguing that a claim for breach of contract was not covered under the CGL policy, the policy limits had been exhausted, and it did not act in bad faith in refusing to defend Viking. On May 14, Viking filed its reply in support of its motion for summary judgment against Liberty Mutual, relying principally on Prisco Serena Sturm Architects, Ltd. v. Liberty Mutual Insurance Co., 126 F.3d 886 (7th Cir.1997) (Prisco).
On June 26, the trial court granted summary judgment in favor of Viking and against Liberty Mutual, finding that Liberty Mutual owed a duty to defend to Viking, that it breached its duty, and that it was estopped from asserting its $100,000 policy limits. However, the trial court did not find that it could say Liberty Mutual's refusal to defend Viking was "vexatious and unreasonable." Ultimately, the court found Liberty Mutual responsible for the $600,000 settlement. With respect to Nationwide's motion for summary judgment against Viking, the court denied this motion, finding there was insufficient evidence to determine whether Viking was an additional insured under the policy.
On July 16, Liberty Mutual filed a motion to reconsider, arguing that the trial court's ruling that estoppel was applicable was erroneous because it was against Illinois law, it cannot be required to pay in excess of its policy limits without a finding of bad faith, and the trial court failed to address the fact that the Woodland complaint alleged only a claim for breach of contract, nor how a potential for coverage existed. On November 1, the trial court denied Liberty Mutual's motion to reconsider, without prejudice.
On January 2, 2003, Viking's attorney wrote to Liberty Mutual's attorney, stating that it had recently discovered the existence of the $10 million excess policy and requested a copy of same. On January 3, Nationwide filed a motion for summary *5 judgment against Viking, arguing that there were no allegations in the Woodland complaint that Viking's liability resulted from Quinn's conduct and there was no coverage because Viking was not an additional insured. Thereafter, on April 24, the trial court granted Nationwide's motion. In reaching its decision, the court stated that "[t]he Woodland litigation was a breach of contract action for property damages."
On May 21, Viking moved to reconsider summary judgment in favor of Nationwide, arguing that Viking's alleged liability arose out of Quinn's operations because Quinn was responsible for actually installing the bracing. According to Viking, it was not involved in the design or bracing of the wall and, therefore, was not responsible for its collapse. The trial court denied this motion on June 19.
On July 10, Viking filed a motion for entry of final order with respect to the trial court's June 26, 2002, order in connection with Liberty Mutual. Thereafter, Liberty Mutual filed its response, arguing that the trial court's June 26 order left unresolved certain issues between Viking and Liberty Mutual, including the question of whether Liberty Mutual acted in bad faith, which must be resolved before it could be required to pay in excess of its policy limits. Liberty Mutual further argued that the trial court's orders of April 24 and June 19, 2003, established that Viking was not entitled to coverage in the Woodland litigation by Liberty Mutual because it was only a breach of contract action, not subject to coverage.
On August 8, Liberty Mutual filed a motion for summary judgment against Viking based on the trial court's April 24 and June 19 orders. Liberty Mutual maintained that the trial court's ruling that Woodland was strictly a breach of contract action established that Viking was not entitled to coverage. On August 13, Viking filed its reply in support of final order, arguing that Liberty Mutual's recent motion for summary judgment was really its second motion to reconsider the trial court's June 26, 2002, order. On August 18, the trial court ordered Liberty Mutual to refile its motion for summary judgment as a motion to reconsider. Liberty Mutual did so the next day. On September 2, Viking filed its brief in opposition to the motion to reconsider and on September 9 Liberty Mutual filed its reply, arguing that because Nationwide was not required to defend Viking, Liberty Mutual should not be required to do so because the claim was based on the same underlying breach of contract action. According to Liberty Mutual, if the Woodland allegations did not trigger a duty on the part of Nationwide, they could not do so on its part.
On September 25, the trial court denied Liberty Mutual's motion to reconsider and entered final judgment in favor of Viking against Liberty Mutual. This appeal followed.

ANALYSIS
A motion for summary judgment is properly granted when the pleadings, depositions, admissions, and affidavits on file establish that no genuine issue as to any material fact exists and, therefore, the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2002); Cramer v. Insurance Exchange Agency, 174 Ill.2d 513, 530, 221 Ill.Dec. 473, 675 N.E.2d 897 (1996). A defendant can demonstrate it is entitled to summary judgment in two ways. 4 R. Michael, Illinois Practice § 40.3, at 271-72 (1989). First, the defendant can affirmatively show that some element of the case must be resolved in its favor. McCoy ex rel. Jones v. Chicago Housing Authority, 333 Ill.App.3d 305, 308, 266 Ill.Dec. 606, *6 775 N.E.2d 168 (2002). Alternatively, the defendant can establish that the plaintiff cannot prove an essential element of the cause of action. McCoy, 333 Ill.App.3d at 308-09, 266 Ill.Dec. 606, 775 N.E.2d 168. "An order granting summary judgment should be reversed if the evidence shows that a genuine issue of material fact exists or if the judgment was incorrect as a matter of law." Carollo v. Al Warren Oil Co., 355 Ill.App.3d 172, 179, 289 Ill.Dec. 919, 820 N.E.2d 994 (2004). We review the trial court's granting of such motion de novo. McNamee v. State of Illinois, 173 Ill.2d 433, 438, 220 Ill.Dec. 147, 672 N.E.2d 1159 (1996).
The duty of an insurer to defend an insured is determined by the allegations of the underlying complaint. Lyons v. State Farm Fire & Casualty Co., 349 Ill. App.3d 404, 406, 285 Ill.Dec. 231, 811 N.E.2d 718 (2004). "A duty to defend arises if the complaint's allegations fall within or potentially within the coverage provisions of the policy." Lyons, 349 Ill. App.3d at 406, 285 Ill.Dec. 231, 811 N.E.2d 718. In this regard, it has been stated that the "threshold requirements for the complaint's allegations are low," and "the underlying complaint is to be liberally construed in favor of the insured, and doubts and ambiguities are to be construed in favor of the insured." Lyons, 349 Ill. App.3d at 407, 285 Ill.Dec. 231, 811 N.E.2d 718. In other words,
"`the insurer has the duty to defend unless the allegations of the underlying complaint demonstrate that the plaintiff in the underlying suit will not be able to prove the insured liable, under any theory supported by the complaint, without also proving facts that show the loss falls outside the coverage of the insurance policy. [Citations.] The insurer may simply refuse to defend only if the allegations of the underlying complaint preclude any possibility of coverage.' [Citation.]" American Country Insurance Co. v. James McHugh Construction Co., 344 Ill.App.3d 960, 975, 280 Ill.Dec. 86, 801 N.E.2d 1031 (2003).
We must first determine "whether there was an `occurrence' within the policy period." R. Franco, Insurance Coverage for Faulty Workmanship Claims Under Commercial General Liability Policies, 30 Tort & Insurance L.J. 785, 788 (Spring 1995). Once an "occurrence" has been established, we must determine whether there was "property damage." 30 Tort & Insurance L.J. at 788. If both an "occurrence" and "property damage" have been established, we must determine whether any exclusions apply. 30 Tort & Insurance L.J. at 788. See also Monticello Insurance Co. v. Wil-Freds Construction, 277 Ill.App.3d 697, 703, 214 Ill.Dec. 597, 661 N.E.2d 451 (1996).
An "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Lyons, 349 Ill. App.3d at 407, 285 Ill.Dec. 231, 811 N.E.2d 718. Although the policy does not define "accident," it has been defined as "`"an unforseen occurrence, usually of an untoward or disastrous character or an undesigned sudden or unexpected event of an inflictive or unfortunate character."' [Citations.]" State Farm Fire & Casualty Co. v. Tillerson, 334 Ill.App.3d 404, 409, 268 Ill.Dec. 63, 777 N.E.2d 986 (2002). It has generally been held that a "CGL policy will not cover a general contractor's suit for breach of contract" and "there is no `occurrence' when a subcontractor's defective workmanship necessitates removing and repairing work." 30 Tort & Insurance L.J. at 789.
The standard policy definition of property damage, which is at issue here, "differentiates between physical damage to *7 tangible property and intangible property losses, such as economic interests. Courts do not consider the latter types of losses to be `property damage.'" 30 Tort & Insurance L.J. at 789. Similarly, a breach of contract claim does not constitute "property damage," "since it does not result from a fortuitous event." 30 Tort & Insurance L.J. at 789.
Although this case does not involve a construction defect in the strict sense since Woodland's complaint was not directed against the contractor, in essence it is the same because the allegations are directed against the construction manager who allegedly failed to properly supervise, allowing faulty bracing, that resulted in a construction defectthe collapse. Moreover, the Woodland complaint alleges that Viking failed to perform its services in a workmanlike manner. Thus, the underlying claim falls within the rubric of defective construction. There is no question that the issue before us is in great dispute. As one Illinois construction attorney has stated, the question of whether defective construction claims fall under CGL policies "lies in chaos." W. Lyman, Is Defective Construction Covered Under Contractors' and Subcontractors' Commercial General Liability Insurance Policies?, Practising Law Institute, Real Estate Law and Practice Course Handbook Series, 491 PLI/Real 505, 513 (April 2003). See also J. O'Connor, What Every Construction Lawyer Should Know About CGL Coverage for Defective Construction, 21 Construction Lawyer 15, 15 (Winter 2001) ("there is a war going on in the construction industry"). The majority rule is that faulty workmanship, standing alone, is generally not covered under CGL policies. Lyman, 491 PLI/Real 505 at 519. See also J. Yang, No Accident: The Scope of Coverage for Construction Defect Claims, Practising Law Institute, Litigation and Administrative Practice Course Handbook Series, 690 PLI/Lit 7, 25 (April 2003); G. Schultz, Commercial General Liability Coverage of Faulty Construction Claims, 33 Tort & Insurance L.J. 257, 259, 261 (Fall 1997); 30 Tort & Insurance L.J. at 785, 786-87; Auto-Owners Insurance Co. v. Home Pride Cos., 268 Neb. 528, 684 N.W.2d 571 (2004) (citing Tillerson for the majority rule).
The question of whether faulty construction is covered under a CGL policy is generally analyzed under the following approaches, either individually or in combination: (1) examination of the policy language, including the existence of an "occurrence," "property damage," or whether an exclusion applies; (2) application of the "business risk," "ordinary and natural consequences," or breach of contract doctrine; or (3) application of the "economic loss" (no "property damage") doctrine. Lyman, 491 PLI/Real at 522. See also Yang, 690 PLI/Lit at 26-37. The rationale for the second approach is "the requirement implicit in every liability insurance policyspecifically, that coverage is provided only for fortuitous losses." Yang, 690 PLI/Lit at 36. See also J. O'Connor, 21 Construction Lawyer at 17; 33 Tort & Insurance L.J. at 258 (same); 30 Tort & Insurance L.J. at 785; Home Pride Cos., 268 Neb. at 535, 684 N.W.2d 571 (citing Indiana Insurance Co. v. Hydra Corp., 245 Ill.App.3d 926, 185 Ill.Dec. 775, 615 N.E.2d 70 (1993)). In this regard,
"if a contractor uses inadequate building materials, or performs shoddy workmanship, he takes a calculated business risk that no damage will take place. If damage does take place, it flows as an ordinary and natural consequence of the contractor's failure to perform the construction properly or as contracted [and][t]here can be no coverage for such damage." Yang, 690 PLI/Lit at 36-37.
*8 Similarly, under the second approach, courts often "look to how the underlying claim is pled." Yang, 690 PLI/Lit at 27-28. In this regard, "[a]llegations of breach of contract typically are viewed as falling outside the scope of coverage of a general liability policy." Yang, 690 PLI/Lit at 28. Thus, courts have held that "such claims are not an `accident' or an `occurrence' covered by the CGL policies which, in their view, are written to cover tort claims." Lyman, 491 PLI/Real at 545.
"Illinois considers construction defects to not constitute an accident or occurrence necessary to trigger coverage under CGL policies." Lyman, 491 PLI/Real at 578, citing Travelers Insurance Co. v. Eljer Manufacturing, Inc., 197 Ill.2d 278, 258 Ill.Dec. 792, 757 N.E.2d 481 (2001); Tillerson, 334 Ill.App.3d 404, 268 Ill.Dec. 63, 777 N.E.2d 986; Wil-Freds Construction, 277 Ill.App.3d 697, 214 Ill.Dec. 597, 661 N.E.2d 451; Hydra Corp., 245 Ill.App.3d 926, 185 Ill.Dec. 775, 615 N.E.2d 70; Diamond State Insurance Co. v. Chester-Jensen Co., 243 Ill.App.3d 471, 183 Ill.Dec. 435, 611 N.E.2d 1083 (1993); Bituminous Casualty Corp. v. Gust K. Newberg Construction Co., 218 Ill.App.3d 956, 161 Ill.Dec. 357, 578 N.E.2d 1003 (1991); Harbor Insurance Co. v. Tishman Construction Co., 218 Ill.App.3d 936, 161 Ill.Dec. 551, 578 N.E.2d 1197 (1991); Qualls v. Country Mutual Insurance Co., 123 Ill.App.3d 831, 78 Ill.Dec. 934, 462 N.E.2d 1288 (1984); Hartford Fire Insurance Co. v. Flex Membrane International, Inc., No. 00 C 5765, 2001 WL 869623 (N.D.Ill. August 1, 2001); American Fire & Casualty Co. v. Broeren Russo Construction, 54 F.Supp.2d 842 (C.D.Ill.1999). See also Yang, 690 PLI/Lit at 17 (citing Tillerson and Flex Membrane International, Inc. under the caption, "Recent Cases Finding No Coverage"); Bruner & O'Connor on Construction Law, § 11.28 (2004) (citing Wil-Freds). Illinois has utilized all of the above identified approaches in reaching its overall conclusion that defective construction claims do not fall within the coverage of CGL policies, as discussed more fully below.

I. Policy Coverage
Liberty Mutual contends that the trial court erred in granting summary judgment in favor of Viking because it owed no duty to defend or indemnify Viking in the Woodland litigation, either because breach of contract claims are not covered by CGL policies, there was no "occurrence," there was no "property damage," or an exclusion applies.
Viking contends that the court must look at the facts alleged, not the legal theory stated, and under the facts alleged here, the complaint alleges an occurrence, the collapse of the wall or insufficient supervision, that resulted in property damages and, therefore, the Woodland complaint was potentially within coverage and triggered Liberty Mutual's duty to defend.

A. General Coverage Provision and Breach of Contract
Liberty Mutual maintains that the Woodland complaint alleged only a breach of contract claim, which type of claim is excluded by its policy. Liberty Mutual also argues that, as a general matter and as a long-standing rule in Illinois, CGL policies do not cover breach of contract claims.
In Hydra Corp., relied upon by Liberty Mutual, Hydra and B.K. Production Specialists (B.K.) entered into a contract whereby Hydra was to construct a building for B.K. Hydra Corp., 245 Ill.App.3d at 927, 185 Ill.Dec. 775, 615 N.E.2d 70. B.K. filed a demand for arbitration against Hydra because the concrete floor developed cracks and the outside of the building was unsightly. Hydra Corp., 245 Ill.App.3d at 928, 185 Ill.Dec. 775, 615 N.E.2d 70. After *9 Hydra refused to pay the amount awarded by the arbitrator, B.K. filed a breach of contract action against Hydra, who tendered defense of the suit to Indiana Insurance Company, its insurance carrier. In response, Indiana filed a complaint for declaratory judgment, seeking a declaration that it had no duty to defend. Hydra Corp., 245 Ill.App.3d at 928, 185 Ill.Dec. 775, 615 N.E.2d 70. The trial court entered judgment on the pleadings in favor of Indiana, finding that B.K.'s breach of contract claim against Hydra was not an occurrence within the coverage of the policy. Hydra Corp., 245 Ill.App.3d at 927, 185 Ill.Dec. 775, 615 N.E.2d 70.
On appeal, the court found that the underlying complaint alleged only that Hydra breached its contractual obligations to furnish its work in a workmanlike manner and that "[t]here [was] no evidence of any unpleaded facts which reveal B.K.'s damages to be other than from Hydra's alleged breach of contract." Hydra Corp., 245 Ill.App.3d at 929, 185 Ill.Dec. 775, 615 N.E.2d 70. The Hydra Corp. court concluded that the general coverage provision of the CGL policy[3] did "not provide coverage for damages resulting from breach of contractual obligations, as [was] the basis for B.K.'s complaint against Hydra." Hydra Corp., 245 Ill.App.3d at 929, 185 Ill.Dec. 775, 615 N.E.2d 70. Accordingly, the court held that Indiana owed no duty to defend. Hydra Corp., 245 Ill.App.3d at 932, 185 Ill.Dec. 775, 615 N.E.2d 70. See also Aetna Casualty & Surety Co. v. Spancrete of Illinois, 726 F.Supp. 204, 206 (N.D.Ill.1989) (holding that the general coverage provision of a CGL policy did not provide coverage for damages resulting from a breach of contract claim alleged against a subcontractor by a general contractor in an underlying lawsuit).
Since the general coverage provision of the CGL policy here is the same as in Hydra Corp. and Spancrete, and we see no reason to depart from those courts' rulings, we conclude that the trial court erred in granting summary judgment in favor of Viking against Liberty Mutual because the general coverage provision of the CGL policy does not cover an underlying claim, like Woodland's, for breach of contract. Even assuming we did not find the trial court's ruling that the Woodland lawsuit was only a breach of contract claim to be the law of the case, it is evident, upon review of the Woodland complaint, that it is based entirely on breach of contract. The only count in the complaint is entitled "breach of contract." Moreover, all of the core allegations focus upon the obligations Viking owed to Woodland under their agreement and Viking's failure to fulfill same. See Whitman Corp. v. Commercial Union Insurance Co., 335 Ill.App.3d 859, 874, 270 Ill.Dec. 103, 782 N.E.2d 297 (2002) (although not a defective construction case, the court found it significant that the first paragraph of the underlying complaint characterized the cause of action as a breach of contract claim and the "wherefore" clause maintained that the defendant failed to fulfill its obligations under a contract and the court held that the insurance carrier owed no duty to defend because the underlying action involved only a breach of contract claim). Based on the foregoing, we find that the Woodland complaint did not fall within the general coverage provision of Liberty Mutual's CGL policy and, therefore, the trial court erred *10 in granting summary judgment in favor of Viking and against Liberty Mutual.

B. Occurrence
Liberty Mutual next maintains that it owed no duty to defend Viking because the Woodland complaint failed to allege an occurrence necessary to trigger coverage under the CGL policy. In this regard, Liberty Mutual argues that the complaint itself alleged that the collapse was not an accident, but due to the foreseeable consequences of Viking's failure to conform to its contractual duties, which is not an occurrence under Illinois law. Viking contends that the facts alleged in the Woodland complaint potentially fell within coverage, thereby triggering Liberty Mutual's duty to defend, since the collapse of the wall was potentially an accident and, thus, an occurrence. Viking further maintains that the complaint does not allege, contrary to Liberty Mutual's argument, that the incident occurred as a result of normal, foreseeable events. Viking further maintains that because Liberty Mutual accepted the defense in the Kratz litigation based on the fact an accident had occurred, i.e., the collapse of the wall, which is the same accident here, the potential for coverage has been demonstrated.[4] Viking also argues that a second occurrence is alleged, i.e., that Viking was hired to provide construction management services, which it did improperly, and which makes this case similar to Prisco. Viking therefore contends that we should follow Prisco's holding like the trial court did.
In Wil-Freds Construction, relied upon by Liberty Mutual, the City of Naperville and Wil-Freds entered into an agreement whereby Wil-Freds was to construct a building for Naperville. Wil-Freds Construction, 277 Ill.App.3d at 699, 214 Ill. Dec. 597, 661 N.E.2d 451. After completion of the building, Naperville filed a complaint against Wil-Freds, et al., alleging breach of contract based on numerous construction defects. Wil-Freds tendered defense of the lawsuit to Monticello, its insurer, who, in response, filed a complaint for declaratory judgment, seeking a declaration that it had no duty to defend. Wil-Freds Construction, 277 Ill.App.3d at 699, 214 Ill.Dec. 597, 661 N.E.2d 451.[5] Thereafter, the parties filed cross-motions for summary judgment. Monticello argued that "because Naperville sought to recover for property damage to the project itself resulting from a breach of contract, there was no occurrence as the term is defined in the CGL policy." Wil-Freds Construction, 277 Ill.App.3d at 700, 214 Ill.Dec. 597, 661 N.E.2d 451. Conversely, Wil-Freds argued that, "Naperville's complaint did allege an `occurrence' because true but unpleaded facts showed that the allegedly defective construction had caused damage to property other than the project itself." Wil-Freds Construction, 277 Ill.App.3d at 700, 214 Ill.Dec. 597, 661 N.E.2d 451. Evidence offered in support of Wil-Freds' motion demonstrated that many of the construction defects were due to subcontractors' work, rather than work performed by Wil-Freds. Wil-Freds Construction, *11 277 Ill.App.3d at 700, 214 Ill. Dec. 597, 661 N.E.2d 451. The trial court granted Monticello's motion and denied Wil-Freds' motion based on the "your product" exclusion in the policy.[6] The Wil-Freds Construction court affirmed, concluding that the trial court did not err in granting summary judgment in favor of Monticello, finding that "the construction defects alleged in Naperville's complaint do not constitute an `occurrence' within the meaning of the CGL policy." Wil-Freds Construction, 277 Ill.App.3d at 702, 214 Ill.Dec. 597, 661 N.E.2d 451.
With respect to an "accident," the Wil-Freds Construction court gave the general definition, quoted above, but noted that "accident" does not include the "natural and ordinary consequences of an act." Wil-Freds Construction, 277 Ill.App.3d at 703, 214 Ill.Dec. 597, 661 N.E.2d 451. The Wil-Freds Construction court relied upon Hydra Corp., finding it to be a "case strikingly similar," in which the court held that "property damage to a building caused by a contractor's defective construction of the building is not an accident and does not, therefore, constitute an occurrence." Wil-Freds Construction, 277 Ill.App.3d at 703, 214 Ill.Dec. 597, 661 N.E.2d 451. Specifically, the court stated:
"Hydra is directly applicable to the present case. Here, as in Hydra, the policy at issue is a standard CGL policy. The underlying action in the present case is, like the underlying action in Hydra, a breach of contract claim alleging the defective construction of a building which resulted in damage to the building itself. Finally, as in Hydra, the underlying complaint here does not include a claim for damage to property other than the building itself. The factual similarity between Hydra and the present case compels us to follow Hydra and hold that the construction defects set forth in Naperville's complaint are the natural and ordinary consequences of the improper construction techniques of Wil-Freds and its subcontractors and, thus, do not constitute an occurrence within the definition in the CGL policy." Wil-Freds Construction, 277 Ill.App.3d at 704, 214 Ill.Dec. 597, 661 N.E.2d 451.
The Wil-Freds Construction court further noted:
"If, for example, Naperville had sued Wil-Freds for the water damage suffered by cars in the parking garage, or a pedestrian sued Wil-Freds for an injury caused by falling concrete, there can be little doubt that Monticello would be required to defend Wil-Freds under the CGL policy, because there would have been `negligent manufacture that results in "an occurrence."' [Citation.] On the other hand, where the only claim is one for a breach of contract alleging property damage to the project itself, we are faced merely with `"an occurrence of alleged negligent manufacture."' [Citation.]" Wil-Freds Construction, 277 Ill. App.3d at 705-06, 214 Ill.Dec. 597, 661 N.E.2d 451.
Similarly, in Flex Membrane International, Inc., an owner sued a contractor for breach of warranty to recover the cost of replacing and repairing a defective roof that the contractor had installed. Flex Membrane International, Inc., slip op. at ____. The contractor sought defense of the action from its insurance carrier who filed *12 a declaratory action and then moved for summary judgment on the basis that the underlying complaint did not allege an "occurrence." Flex Membrane International, Inc., slip op. at ____. The definitions of "accident" and "property damage" in the policy at issue were the same as in the instant case. In finding no duty to defend, the Flex Membrane International, Inc. court stated:
"The underlying suit brought by [the owner] against [the contractor] does not allege property damage caused by an accident as the law defines that term. * * * [T]he shattering and leaking of a roof are the natural and ordinary consequences of defective roof construction. [Citation.] The natural and ordinary consequences of an act do not constitute an accident." Flex Membrane International, Inc., slip op. at ____.
Specifically, the court found that CGL policies "do not `cover "an occurrence of alleged negligent manufacture"; [they] cover[ ] negligent manufacture that results in "an occurrence".' [Citation.] In a case like this one, negligent manufacture may result in an occurrence when the result is damage to something other than the structure worked on." Flex Membrane International, Inc., slip op. at ____ (citing Pekin Insurance Co. v. Richard Marker Assocs., 289 Ill.App.3d 819, 224 Ill.Dec. 801, 682 N.E.2d 362 (1997), discussed below). Because the only damage was to the structure the contractor worked on, the court concluded that "there was no `occurrence' within the meaning of the insurance policy." Flex Membrane International, Inc., slip op. at ____. See also Tillerson, 334 Ill.App.3d at 409, 268 Ill. Dec. 63, 777 N.E.2d 986 (stating that "[w]here the defect is no more than the natural and ordinary consequences of faulty workmanship, it is not caused by an accident," and holding that the underlying plaintiffs' complaint "allege[d] no unforseen or undesigned, sudden, or unexpected event" and the construction defects set forth were "the natural and ordinary consequences of [the defendant's] alleged improper construction techniques," thus finding that State Farm owed no duty to defend its insured); Hydra Corp., 245 Ill. App.3d at 930, 185 Ill.Dec. 775, 615 N.E.2d 70 (holding that the damages alleged, "the cracks in the floor and the loose paint on the exterior of the building," were "the natural and ordinary consequences of allegedly installing defective concrete flooring and applying the wrong type of paint," and, therefore, no occurrence occurred invoking the insurer's duty to defend the insured); Diamond State Insurance Co., 243 Ill.App.3d at 483-84, 183 Ill.Dec. 435, 611 N.E.2d 1083 (stating that, although the mere failure of a product to perform as warranted "is most likely to be unintentional, it cannot be considered an `accident' within the meaning of the policy because the `natural and ordinary consequences of an act do not constitute an accident' [citation]" and, therefore, no occurrence within the meaning of the policy); Broeren Russo Construction, 54 F.Supp.2d at 844-48 (relying on Diamond State Insurance Co., Wil-Freds Construction, and Hydra Corp., stating that "the natural results of negligent and unworkmanlike construction of a building do[es] not constitute an `occurrence,'" and holding that "money expended in its [the plaintiff's] attempt to stop the leaking, the cost of complete and proper reinstallation of the System and related water damage repairs," were damages caused solely by the defendant's alleged breach of contract in failing to properly install the system and were the natural and ordinary consequences of the alleged breach of contract and, thus, were not the result of an "occurrence" and were not covered by the CGL policy).
*13 Conversely, in Pekin Insurance Co., the plaintiffs in the underlying lawsuit, sued a contractor, the defendant, in both the underlying case and case before the trial court, who was hired to build a structure housing their residence and business, for breach of contract and architectural services, alleging that his improper construction caused water pipes to burst, resulting in property damage to "`carpeting, dry-wall, antique furniture, clothing, personal mementoes and pictures.'" Pekin Insurance Co., 289 Ill.App.3d at 820, 224 Ill.Dec. 801, 682 N.E.2d 362. The defendant tendered defense of the lawsuit to its insurance carrier, Pekin Insurance Company (Pekin), who in turn, filed a declaratory action seeking a declaration that it was not required to defend the defendant. Pekin Insurance Co., 289 Ill.App.3d at 820, 224 Ill.Dec. 801, 682 N.E.2d 362. The Pekin Insurance Co. policy defined "occurrence" and "property damage" the same as in the instant case. The trial court granted judgment in favor of Pekin, finding it owed no duty to defend, relying on Hydra Corp. Pekin Insurance Co., 289 Ill.App.3d at 821, 224 Ill.Dec. 801, 682 N.E.2d 362. On appeal, the appellate court, in addressing the issue before it, noted that the policy at issue was a CGL policy and that
"[s]uch policies are intended to provide coverage for injury or damage to the person or property of others; they are not intended to pay the costs associated with repairing and replacing the insured's defective work and products, which are purely economic losses. [Citation.] Consequently, when the underlying complaint alleges only damage to the structure itself, courts have found that there was no coverage." Pekin Insurance Co., 289 Ill.App.3d at 822, 224 Ill.Dec. 801, 682 N.E.2d 362.
In this respect, the Pekin Insurance Co. court found both Hydra Corp. and Wil-Freds Construction distinguishable because the underlying complaints in those cases "did not allege damage to other property, only to the building itself, so that there was no `accident' or `occurrence.'" Pekin Insurance Co., 289 Ill.App.3d at 822, 224 Ill.Dec. 801, 682 N.E.2d 362. Conversely, the Pekin Insurance Co. court relied upon Trovillion v. United States Fidelity & Guaranty Co., 130 Ill.App.3d 694, 86 Ill.Dec. 39, 474 N.E.2d 953 (1985), in which "the underlying complaint alleged not only damage to the building from faulty workmanship, but also encompassed damage to other materials not furnished by the insured." Pekin Insurance Co., 289 Ill.App.3d at 822, 224 Ill.Dec. 801, 682 N.E.2d 362. In Pekin Insurance Co., the court found that the underlying complaint alleged
"that faulty workmanship caused an accident in the form of continuous or repeated condensation which dripped and damaged furniture. This is more than an allegation that the building itself was defective. Although not mentioned by the parties, we also note that the [plaintiffs'] complaint alleged that they sustained damage to furniture, clothing, and antiques when uninsulated pipes froze and burst." Pekin Insurance Co., 289 Ill.App.3d at 823, 224 Ill.Dec. 801, 682 N.E.2d 362.
Accordingly, the court stated that this allegation, too, fell within the meaning of an "accident" and an "occurrence." Pekin Insurance Co., 289 Ill.App.3d at 823, 224 Ill.Dec. 801, 682 N.E.2d 362.
In Prisco, relied upon by Viking, a school hired Prisco Serena Sturm Architects, who was responsible for both design and construction of the school. Prisco, 126 F.3d at 888. The school then hired Axelrod Construction to act as a general contractor. Prisco, 126 F.3d at 888. Axelrod was required to procure a CGL policy, naming both the school and Prisco as insureds, *14 which it obtained through Liberty Mutual. Prisco, 126 F.3d at 889. The school filed a lawsuit against Axelrod, alleging its performance was unsatisfactory and resulted in damage to the school. Prisco, 126 F.3d at 888. In addition, the school alleged a claim against Prisco, maintaining that it was responsible for the same damage because
"allegedly it had failed to find out that the quality of Axelrod's work did not conform to the contract, it had failed to ascertain that Axelrod's work was not proceeding in accordance with the contract, it had not kept the School correctly informed about the quality of Axelrod's work, and it had failed to guard against defects and deficiencies in Axelrod's performance." Prisco, 126 F.3d at 888.
Prisco tendered its defense to Liberty Mutual. Thereafter, a coverage dispute began between the parties. The district court, through a series of orders, granted summary judgment in favor of Prisco. Prisco, 126 F.3d at 888. Liberty Mutual then appealed to the Seventh Circuit Court of Appeals.
In addressing the claim before it, the Seventh Circuit first concluded that "[m]any of the policy provisions on which Liberty relies are ambiguous and must, therefore, be construed to provide coverage." Prisco, 126 F.3d at 888. The court then reviewed the policy at issue, noting that the body of the coverage was included in standard form CG 00 01 11 88.[7] The court then noted that several special endorsements were also relevant. First, an "Additional Insured-Engineers, Architects, or Surveyors" endorsement modified the general body of the policy, Section II, "WHO IS AN INSURED,"[8] which stated that "The insurance with respect to such architects, engineers, or surveyors does not apply to `bodily injury,' `property damage,' * * * arising out of the rendering of or the failure to render any professional services by or for you, including: * * * [s]upervisory, inspection, or engineering services." Prisco, 126 F.3d at 889. Secondly, an "Additional Insured-Designated Person or Organization" endorsement also amended section II, "WHO IS AN INSURED," and stated, "as an insured the person or organization shown in the Schedule as an insured but only with respect to liability arising out of your operations * * *." Prisco, 126 F.3d at 889. Lastly, the court noted that the policy contained a long list of exclusions, including exclusion (k), the same as is present here. Prisco, 126 F.3d at 889. "Occurrence" and "property damage" were defined the same in Prisco as they are in the instant case. Prisco, 126 F.3d at 890.
Liberty Mutual argued on appeal that it was not required to defend because "the complaints alleged property damage only to the building itself, not to other property, they did not allege property damage caused by an `occurrence' within the meaning of the policy," "the `own product' exclusion of the policy, exclusion (k), applies here to exclude coverage for property damage to the building itself," and "the policy had a professional services exclusion that operated to exclude coverage * * *, because all of the allegations against it pertained to its professional services." Prisco, 126 F.3d at 890. Liberty Mutual relied upon Bituminous Casualty Corp., Diamond State Insurance Co., Hydra Corp., and Wil-Freds Construction in support *15 of its position. Conversely, Prisco distinguished these cases, arguing that they involved claims against a contractor for its own work, not claims against an additional insured for negligence in discovering defects. Prisco, 126 F.3d at 891. Prisco further maintained that United States Fidelity & Guaranty Co. v. Wilkin Insulation Co., 144 Ill.2d 64, 161 Ill.Dec. 280, 578 N.E.2d 926 (1991), was controlling on the issue.[9]
The Prisco court first found that the definition of "occurrence" in Wilkin Insulation Co. was similar to the definition before it,[10] and agreed with Prisco that the fact it was not the party who performed the work distinguished the case before it from the cases relied upon by Liberty Mutual. Prisco, 126 F.3d at 891. Accordingly, the Prisco court concluded that Prisco's "negligence in performing [its] role prevented the School from discovering the faulty construction work." Prisco, 126 F.3d at 891. Specifically, relying on Wilkin Insulation Co., the court found that Prisco's negligence in failing to uncover defects in the general contractor's work and negligent certification of the work, which resulted in the incorporation of defective components into the building, was sufficient to allege an "occurrence" within the meaning of the CGL policy. Prisco, 126 F.3d at 891. Ultimately, however, the Prisco court concluded that the district court erred in granting summary judgment in favor of Prisco because the "professional services liability" exclusion contained in the endorsement relative to architects barred Prisco's claim. As such, the court held that Liberty Mutual was entitled to summary judgment in its favor. Prisco, 126 F.3d at 894.
Initially, we do not find Prisco controlling. Although the allegations of the nature of the breach are similar to those here, the court's analysis is not persuasive. First, the court relied on a case whose definition of "occurrence" was different than the policy before it. Secondly, and more importantly, the Prisco court relied upon the incorporation holding of Wilkin Insulation Co. However, the holding and rationale of Wilkin Insulation Co. has been limited to the unique situation of incorporating asbestos into a larger structure, i.e., a building. Eljer Manufacturing, Inc., 197 Ill.2d at 306, 258 Ill.Dec. 792, 757 N.E.2d 481. The Seventh Circuit's reliance on Wilkin Insulation Co. ignores this holding and, instead, expands it to include incorporation of other things, particularly, construction services. There is simply no basis nor rationale for doing so and, thus, we do not follow Prisco's holding regarding "occurrence."
Conversely, we find the line of cases with respect to "natural and ordinary consequences" controlling and find no "occurrence" was alleged in the Woodland complaint. Although Viking argues that the Woodland complaint does not allege that the incident happened as a result of normal, foreseeable events, this argument is clearly erroneous. Paragraph 15 of the complaint states that "the north portion of the `E' section * * * collapsed under normal, foreseeable, and expected conditions due to a lack of requirement bracing and/or construction defects." Here, the collapse of the wall and section of the building was the ordinary and natural consequence of improper bracing, i.e., faulty construction work, which resulted from, at least in part, Viking's breach of its contractual *16 duties to ensure proper construction methods were employed.
We further find, contrary to Viking's argument, that the Woodland complaint does not allege, or even potentially seek, damages to other parts of the school. It is clear there are no factual allegations that anything else was damaged. Viking only alleged damages to section E of the building. Moreover, even though one paragraph of the complaint utilizes the phrase "without limitation," Woodland clearly sought only damages for the cost to repair and replace the damaged section of the subject property. Specifically, in paragraph 15, Woodland alleged damages of $1,248,383.66, which represented "the fair and reasonable cost to repair and replace the damaged section of the building." In paragraph 20, although Woodland used the phrase "without limitation," it sought the same amount of damages, $1,248,383.66. If Woodland were seeking damages to other things, the amount sought would certainly be different than the amount claimed to represent "the fair and reasonable cost to repair and replace the damaged section of the building." Even if we found that Woodland alleged damages to other parts of the building, the cases discussed above make it clear that there must be damage to something other than the structure, i.e., the building, in order for coverage to exist. See Wil-Freds Construction, 277 Ill.App.3d at 705-06, 214 Ill.Dec. 597, 661 N.E.2d 451 (the court found no "occurrence" where there were only allegations of damages to the project itself); Flex Membrane International, Inc., No. 00 C 5765 (damages alleged only with respect to the structure itself did not constitute an allegation of "occurrence").
As stated above, we find that the damages claimed by Woodland were the natural and ordinary consequences of defective workmanship and, accordingly, did not constitute an "occurrence." As such, the trial court erred in concluding that there was potential coverage under Liberty Mutual's policy requiring it to defend Viking. Specifically, the factual situation and allegations of the underlying complaint here are akin to those found in Wil-Freds Construction and Hydra Corp. As in both of those cases, a standard CGL policy is at issue. Additionally, the underlying action is a breach of contract claim, alleging damage due to defective workmanship. As in both of those cases, Woodland here did not claim damage for anything other than the section of the building itself. Moreover, the instant case is similar to Flex Membrane International, Inc., where the court found that the underlying complaint merely alleged negligent workmanship, not negligent workmanship that resulted in damage to something other than the structure worked upon. Lastly, Pekin Insurance Co. supports a conclusion here that no "occurrence" was alleged. In Pekin Insurance Co., the court found potential coverage under the CGL policy for a claim of defective workmanship where the underlying complaint alleged damages to personal property, i.e., to something other than the structure itself.
Based on the foregoing, we find that the trial court erred in granting summary judgment in favor of Viking because the Woodland complaint failed to allege an "occurrence" and, therefore, failed to invoke Liberty Mutual's duty to defend.

C. Property Damage
Further support for a finding that the trial court erred in granting summary judgment in favor of Viking also is based on our consideration of the existence of "property damage." A line of Illinois cases holds that where the underlying complaint alleges only damages in the nature of repair and replacement of the defective *17 product or construction, such damages constitute economic losses and do not constitute "property damage." For example, in Tillerson, State Farm filed a declaratory action against the defendant contractor, its insured, seeking a declaration that it was not required to defend the contractor in an underlying lawsuit filed by the homeowner plaintiffs against him for breach of express warranty of workmanship, implied warranty of habitability, and implied warranty of fitness. Tillerson, 334 Ill.App.3d at 405, 268 Ill.Dec. 63, 777 N.E.2d 986. The trial court concluded that State Farm had a duty to defend. On appeal, the Tillerson court addressed the issue of whether the underlying complaint alleged "property damage." In evaluating this question, the court stated that CGL policies "`are not intended to pay the costs associated with repairing and replacing the insured's defective work and products, which are purely economic losses.' [Citations.]" Tillerson, 334 Ill.App.3d at 410, 268 Ill.Dec. 63, 777 N.E.2d 986. Specifically, according to the court, "[f]inding coverage for the cost of replacing or repairing defective work would transform the policy into something akin to a performance bond.' [Citations.]" Tillerson, 334 Ill. App.3d at 410, 268 Ill.Dec. 63, 777 N.E.2d 986. The Tillerson court found that the plaintiffs in the underlying case "merely [sought] either the repair or the replacement of defective work or the diminishing value of the home." Tillerson, 334 Ill. App.3d at 410, 268 Ill.Dec. 63, 777 N.E.2d 986. Accordingly, the court concluded that the allegations did not potentially fall within the policy's coverage and State Farm owed no duty to the defendant. Tillerson, 334 Ill.App.3d at 409, 268 Ill.Dec. 63, 777 N.E.2d 986. See Eljer Manufacturing, Inc., 197 Ill.2d at 314, 258 Ill.Dec. 792, 757 N.E.2d 481 (refusing to define "property damage" to include economic loss since CGL policies would then function "as a performance bond," which is not the role of such policies); Diamond State Insurance Co., 243 Ill.App.3d at 479-80, 183 Ill.Dec. 435, 611 N.E.2d 1083 (the State's complaint against the contractor for failure of an air conditioning system the contractor had installed was insufficient to create a duty to defend on the part of the contractor's insurance carrier where only economic loss was alleged, specifically, "[t]he cost of repairing or replacing the insured's own allegedly defective part is clearly not considered property damage under the policies in question" and "[m]ere allegations of repair and modification without any allegations of physical injury are insufficient to invoke coverage under the physical injury prong of the property damage provision"); Bituminous Casualty Corp., 218 Ill.App.3d at 966, 161 Ill.Dec. 357, 578 N.E.2d 1003 (the State's complaint against contractors for breach of contract, seeking damages in the nature of the replacement and repair of an HVAC system installed by the contractors, alleged only economic losses due to the installation of an inadequate system and, thus, the underlying complaint failed to allege a loss caused by an "occurrence" sufficient to invoke coverage under a CGL policy). See also Whitman Corp., 335 Ill.App.3d at 874, 270 Ill. Dec. 103, 782 N.E.2d 297 (holding that the underlying complaint, seeking only damages for breach of contract, i.e., repair and replacement of the insured's defective work, did not trigger coverage).
Although not specifically addressed by the parties, we also find, based on the economic loss cases discussed above, that the Woodland complaint merely sought economic damages, which do not constitute "property damages." As also discussed above, the Woodland complaint merely sought repair and replacement of the damaged product. This has clearly been held to constitute only economic losses that are *18 not covered by the CGL policy. See Tillerson, 334 Ill.App.3d at 410, 268 Ill.Dec. 63, 777 N.E.2d 986; Diamond State Insurance Co., 243 Ill.App.3d at 479-80, 183 Ill.Dec. 435, 611 N.E.2d 1083.
Based upon the foregoing reasons, we conclude that the trial court erred in granting summary judgment in favor of Viking and against Liberty Mutual since Liberty Mutual owed no duty to defend Viking under the CGL policy. In light of our disposition, we therefore need not address the other issues raised by the parties, including the applicability of any exclusions, exhaustion of the policy limits, estoppel, or bad faith.

CONCLUSION
For the reasons stated, we reverse the judgment of the circuit court of Cook County.
Reversed.
WOLFSON and GARCIA, JJ., concur.
NOTES
[1] Continental Casualty Company is Viking's professional liability insurance carrier. Although it is identified as an appellee and the brief filed indicates it is on behalf of both Viking and Continental Casualty, the arguments here relate only to Viking.
[2] Exclusion (a) states: "This insurance does not apply to * * * `Bodily injury' or `property damage' expected or intended from the standpoint of the insured. * * *"
[3] The general coverage provision stated: "`The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of * * * property damages to which this insurance applies, caused by an occurrence.'"
[4] This argument is without merit. Clearly, the causes of action are different. As noted by the court in Wil-Freds Construction, discussed below, there is a difference between personal injury like that sustained by Kratz, which requires an insurer to defend, and a claim for "negligent manufacture," which does not require the insurer to defend. Wil-Freds Construction, 277 Ill.App.3d at 705-06, 214 Ill.Dec. 597, 661 N.E.2d 451.
[5] The policy at issue in Wil-Freds defined occurrence differently than the policy here since it included as part of the definition a clause that is now an exclusion. Wil-Freds Construction, 277 Ill.App.3d at 699, 214 Ill.Dec. 597, 661 N.E.2d 451.
[6] The policy stated: "`This insurance does not apply: * * * (n) to property damage to the named insured's products arising out of such products or any part of such products.'" Wil-Freds Construction, 277 Ill.App.3d at 700, 214 Ill.Dec. 597, 661 N.E.2d 451. This exclusion is similar to exclusion (k) contained in the CGL here, but which is inapplicable to Viking.
[7] Here, the policy is standard form CG 00 01 10 93.
[8] The same form endorsement is included in the CGL policy at issue here, but Viking is not included as an additional named insured on the schedule attached to this form.
[9] Wilkin Insulation Co. involved asbestos and the question of whether its incorporation into a building resulted in "property damage."
[10] The court, in so finding, ignored the last phrase of the definition in Wilkin Insulation Co. that is now included as an exclusion.