2019 IL App (1st) 180743

FIRST DIVISION
March 29, 2019

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

No. 1-18-0743

| | | |
|---|---|---|
| ACUITY INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff and Third-Party Defendant-Appellee, | ) | |
| | ) | Appeal from the |
| v. | ) | Circuit Court of |
| | ) | Cook County. |
| 950 WEST HURON CONDOMINIUM ASSOCIATION, | ) | |
| BELGRAVIA GROUP, LTD., BELGRAVIA | ) | No. 2013 CH 23100 |
| CONSTRUCTION CORPORATION, MASONRY | ) | |
| SYSTEMS, and DENK & ROCHE, LTD., | ) | Honorable |
| | ) | Anna Demacopolous, |
| Defendants | ) | Judge Presiding. |
| | ) | |
| (Cincinnati Insurance Company, Third-Party Plaintiff and | ) | |
| Intervenor-Appellant). | ) | |

PRESIDING JUSTICE MIKVA delivered the judgment of the court, with opinion.
Justices Pierce and Walker concurred in the judgment and opinion.

**OPINION**

¶ 1     This case raises the issue of when a complaint filed against a subcontractor on a construction project is sufficient to trigger a duty to defend under a commercial general liability policy. The two insurers who are before us and provided coverage to the same carpentry subcontractor saw this issue quite differently.

¶ 2     Acuity Insurance Company (Acuity) filed an action seeking a declaration that it owed its insured, carpentry subcontractor Denk & Roche Builders, Inc. (Denk & Roche), no duty to

defend it in a construction lawsuit. Cincinnati Insurance Company (Cincinnati)—which also insured Denk & Roche, did defend it, and ultimately settled all claims against it—intervened to seek equitable contribution from Acuity. The trial court agreed with Acuity that there was no duty to defend and ruled in its favor and against Cincinnati on cross-motions for summary judgment. For the reasons that follow, we reverse and remand for further proceedings.

¶ 3                                    I. BACKGROUND

¶ 4     The condominium association for the building located at 950 West Huron Street in Chicago, Illinois (Association), sued its general contractor and construction manager Belgravia Group, Ltd., and Belgravia Construction Corporation (collectively Belgravia). The Association sought to recover for alleged defects from Belgravia's unworkmanlike construction of the building envelope that allowed water to infiltrate and cause damage. Belgravia, in turn, filed a third-party complaint against its subcontractors that worked on the building, including the carpentry subcontractor Denk & Roche. Denk & Roche held commercial general liability (CGL) insurance policies with two insurers during the relevant period—one with Cincinnati that was effective January 1, 2000, through June 1, 2007, and another with Acuity effective June 1, 2007, through December 31, 2007, with Acuity renewal policies covering through December 31, 2013.

¶ 5     Denk & Roche tendered its defense to both insurers. Cincinnati agreed to defend and represented Denk & Roche to a settlement of the construction claims. Acuity denied from the outset that the allegations against Denk & Roche triggered a duty to defend under its CGL policy and filed this suit seeking a declaration to that effect, naming as defendants Denk & Roche, another subcontractor, Belgravia, and the Association. Cincinnati intervened in this case and filed a third-party counterclaim against Acuity, seeking declarations that Acuity owed Denk & Roche a defense and that Acuity therefore owes Cincinnati equitable contribution. The relevant

details draw from the two insurers' cross-motions for summary judgment and various attachments in support of those motions.

¶ 6                    A. Allegations Against Denk & Roche

¶ 7    In the Association's operative second amended verified complaint (Association complaint), it alleged that "[o]n or about June 28, 2002, [after the Association took] possession, but prior to the completion of the construction, Belgravia *** became aware of numerous conditions and defects with the building, including extensive water infiltration of the building." After raising the issues with Belgravia, the Association alleged that Belgravia "retained contractors *** to provide cosmetic 'fixes' which did not address the aforementioned design and construction defects and problems." A "forensic analysis which required openings and penetrations in the building envelope" in September 2011 and May 2012 revealed to the Association the full extent of the construction and design defects allegedly caused by Belgravia. The Association enumerated several categories of defects attributable to Belgravia or its agents, including improper seals at various doors, masonry problems, improperly installed flashings at doors and windows, and a host of other construction issues. These issues allegedly led to water damage, thus "interfering with the habitation and usage of the common elements and individual condominium units within the building." The Association alleged that it "has spent substantial sums of money to identify, correct and remediate" these damages and "will incur substantial sums relating to the cost of future repairs."

¶ 8    In Belgravia's operative second amended third-party complaint (Belgravia complaint), Belgravia incorporated the Association complaint by reference and briefly mentioned photographs not included in the record on appeal that show "alleged property damage to carpet, wood floors, and other items allegedly resulting from water damage." The Belgravia complaint

3

contained 23 counts of breach of contract and negligence against Denk & Roche and five other subcontractors. Almost every count contains a nearly identical list of masonry, construction, fixture installation, and sealant defects that collectively are alleged to have contributed to the building's water infiltration issue. The first four counts were leveled against Denk & Roche, based on breach of its carpentry subcontract with Belgravia, breach of implied warranty, breach of indemnity, and negligent construction. Belgravia alleged that if it was found "liable to the [Association] in any amount whatsoever," then its liability was "because of the defective work performed by [Denk & Roche]." As with the counts against the other subcontractors, Belgravia's claims against Denk & Roche described the particular services for which Belgravia retained the carpentry firm, including for "[a]ll rough and finish carpentry," "[c]aulking of all items to be installed," "except for windows and glass patio doors," and installation of doors, frames, and "[w]indows and sliding and swinging glass doors" in the Association's building. In the breach of contract counts, Belgravia alleged Denk & Roche breached its contractual duty to provide workmanlike construction services and, in the negligence count, alleged it has "personally sustained and will continue to sustain costs [for] investigation, inspection, evaluation and repair of the Building, consulting fees, engineering fees, attorneys fees and other losses" as a proximate result of Denk & Roche's poor workmanship.

¶ 9                    B. Denk & Roche's CGL Policy With Acuity

¶ 10    Acuity issued a CGL policy to Denk & Roche that obliged Acuity to "pay those sums that the insured becomes legally obligated to pay as damages because of *** property damage *** to which this insurance applies." It further provided that Acuity "w[ould] have the right and duty to defend the insured against any suit seeking those damages." Coverage applies under the policy to property damage that "is caused by an occurrence that takes place in the coverage territory" and

"occurs during the policy period." The policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions," but does not define "accident." It defines "property damage" to mean "[p]hysical injury to tangible property, including all resulting loss of use of that property," as well as "[l]oss of use of tangible property that is not physically injured."

¶ 11                                    C. Procedural History

¶ 12    Acuity filed this suit for declaratory judgment on October 10, 2013, naming as defendants the Association, Belgravia, the subcontractor Masonry Systems, and Denk & Roche. On July 14, 2015, Acuity moved for partial summary judgment for a declaration that it owed no duty to defend Belgravia or any of its subcontractors—including Denk & Roche—as named insureds under the CGL policies it issued.

¶ 13    Cincinnati petitioned to intervene on April 26, 2016, and the trial court later allowed it to intervene, over Acuity's objections. On April 26, 2016, Cincinnati also filed its two-count third-party complaint for declaratory judgment against Acuity. In count I, Cincinnati asked for a declaration that Acuity "owe[d] a duty to defend Denk & Roche with respect to" the underlying case; in count II, it sought reimbursement under equitable contribution "for the proportionate share of defense fees and costs paid by Cincinnati which should have been paid by Acuity."

¶ 14    At various points in March through July 2017, counts against other defendants were dismissed, until the sole remaining issue in the case was Cincinnati's claim against Acuity "for reimbursement of defense costs."

¶ 15    On March 8, 2017, Acuity moved to dismiss Cincinnati's third-party complaint, arguing that Cincinnati lacked standing to seek a declaration regarding Acuity's policy obligations to its insureds and that Cincinnati's complaint failed to state a cause of action for equitable

5

contribution because the policies are consecutive, rather than concurrent, "and hence do not cover the same risks." After hearing argument on Acuity's fully briefed motion to dismiss, the trial court granted dismissal of count I (for a duty to defend declaration) but denied dismissal of count II (for equitable contribution) on July 18, 2017.

¶ 16 On December 20, 2017, Acuity moved for summary judgment on the remaining count II in Cincinnati's complaint, arguing that it had no obligation to contribute to Cincinnati because it had no duty to defend Denk & Roche. Acuity also claimed that, even if it had a duty to defend, Cincinnati had no right to equitable contribution because the two insurers did not insure the same risk. Cincinnati filed a cross-motion for summary judgment and opposition to Acuity's motion for summary judgment. The parties briefed their motions, and the trial court heard argument on March 6, 2018. On that date, the trial court issued a one-page, handwritten order, granting summary judgment for Acuity and denying judgment for Cincinnati, finding that "the allegations of the underlying complaints did not allege damages caused by an occurrence" and "[a]s Acuity did not owe a duty to defend, Cincinnati is not entitled to equitable contribution."

¶ 17                                    II. JURISDICTION

¶ 18 Cincinnati timely filed its notice of appeal on April 4, 2018, challenging the trial court's order of March 6, 2018. We have jurisdiction under Illinois Supreme Court Rules 301 and 303, governing appeals from final judgments entered by the circuit court in civil cases. Ill. S. Ct. R. 301 (eff. Feb. 1, 1994); R. 303 (eff. Jan. 1, 2015).

¶ 19                                    III. ANALYSIS

¶ 20 Summary judgment is appropriate when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c)

(West 2016). By filing cross-motions for summary judgment, the parties agree that there are no genuine issues of material fact, only a question of law is at issue, and invite the trial court to decide the issues based on the record. *Milwaukee Mutual Insurance Co. v. J.P. Larsen, Inc.*, 2011 IL App (1st) 101316, ¶ 7.

¶ 21   The construction of an insurance policy is a question of law, subject to *de novo* review. *Travelers Insurance Co. v. Eljer Manufacturing, Inc.*, 197 Ill. 2d 278, 292 (2001). In construing the language of the policy, the court's primary objective is to ascertain and give effect to the intent of the parties to the contract. *Id.* "If the words of a policy are clear and unambiguous, 'a court must afford them their plain, ordinary, and popular meaning.' " (Emphasis omitted.) *Id.* at 292-93 (quoting *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 108 (1992)). "Conversely, if the language of the policy is susceptible to more than one meaning, it is considered ambiguous and will be construed strictly against the insurer who drafted the policy and in favor of the insured." *Id.* at 293. "Construction of the policy should include 'due regard to the risk undertaken, the subject matter that is insured and the purposes of the entire contract.' " *Larsen*, 2011 IL App (1st) 101316, ¶ 8 (quoting *Outboard Marine*, 154 Ill. 2d at 108).

¶ 22   Cincinnati argues that the trial court erred in granting summary judgment to Acuity and declaring that Acuity owed Denk & Roche no duty to defend in the underlying suit. Cincinnati argues it is entitled to equitable contribution from Acuity for undertaking that defense and seeks a prove-up hearing to determine the proper amount of reimbursement under equitable contribution. We take each argument in turn.

¶ 23                                    A. Duty to Defend

¶ 24   "To determine an insurer's duty to defend its insured, the court must look to the allegations of the underlying complaint and compare those allegations to the relevant coverage

7

provisions of the insurance policy." *Monticello Insurance Co. v. Wil-Freds Construction, Inc.*, 277 Ill. App. 3d 697, 701 (1996). An insurer's duty to defend arises if those allegations fall within, or potentially within, those coverage provisions. *Viking Construction Management, Inc. v. Liberty Mutual Insurance Co.*, 358 Ill. App. 3d 34, 41 (2005). "The allegations of the underlying complaint must be liberally construed in favor of the insured [citation], and any doubt about coverage should be resolved in favor of the insured [citation]." *Pekin Insurance Co. v. Richard Marker Associates, Inc.*, 289 Ill. App. 3d 819, 821 (1997).

¶ 25    Denk & Roche's CGL policy with Acuity obligates the insurer to defend Denk & Roche in any suit to recover for "property damages" caused by an "occurrence." We must determine, therefore, whether the underlying complaint alleged such property damage from a covered occurrence. *Larsen*, 2011 IL App (1st) 101316, ¶ 17.

¶ 26    The Acuity insurance policy is a CGL policy, which is intended "to provide coverage for injury or damage to the person or property of others [and not] to pay the costs associated with repairing or replacing the insured's defective work and products, which are purely economic losses." *Richard Marker*, 289 Ill. App. 3d at 822. "A CGL policy 'does not cover an accident of faulty workmanship but rather faulty workmanship which causes an accident.' " *Id.* at 823 (quoting *Western Casualty & Surety Co. v. Brochu*, 105 Ill. 2d 486, 498 (1985)).

¶ 27    "Property damage" is defined under the policy as either "[p]hysical injury to tangible property, including all resulting loss of use of that property," or "[l]oss of use of tangible property that is not physically injured." Our supreme court has held that "property damage" in a CGL policy does not include "[p]urely economic losses, such as damages for inadequate value, costs of repair or replacement, and diminution in value that result from a product's inferior quality or its failure to perform for the general purposes for which it was manufactured and sold

8

*** absent physical injury to tangible property." (Internal quotation marks omitted.) *Eljer*, 197 Ill. 2d at 312.

¶ 28    The CGL policy defines an "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Although "accident" is not defined in the policy, Illinois courts have consistently defined it as "an unforeseen occurrence, usually of an untoward or disastrous character or an undesigned sudden or unexpected event of an inflictive or unfortunate character." (Internal quotation marks omitted.) *Larsen*, 2011 IL App (1st) 101316, ¶ 26; *Stoneridge Development Co. v. Essex Insurance Co.*, 382 Ill. App. 3d 731, 749 (2008); *Country Mutual Insurance Co. v. Carr*, 372 Ill. App. 3d 335, 340 (2007); *State Farm Fire & Casualty Co. v. Tillerson*, 334 Ill. App. 3d 404, 409 (2002). "Where the defect is no more than the natural and ordinary consequences of faulty workmanship, it is not caused by an accident." *Tillerson*, 334 Ill. App. 3d at 409.

¶ 29    We have repeatedly recognized that while a CGL policy will not insure a contractor for the cost of correcting construction defects, "damage to something other than the project itself *does* constitute an 'occurrence' under a CGL policy." (Emphasis in original.) *Larsen*, 2011 IL App (1st) 101316, ¶ 27 (citing *CMK Development Corp. v. West Bend Mutual Insurance Co.*, 395 Ill. App. 3d 830, 832 (2009), citing *Stoneridge*, 382 Ill. App. 3d at 752). And damage that is not "merely associated with the repair or replacement" of the insured's faulty work is "property damage" under the CGL policy. *Id. ¶* 21.

¶ 30    A number of the cases cited by the parties examine whether there was any allegation of an occurrence or of property damage in the context of a suit to determine an insurer's obligation to defend a developer, general contractor, construction manager, or other firm tasked with constructing or supervising construction of an *entire* building. See, *e.g.*, *CMK Development*, 395

Ill. App. 3d at 832; *Stoneridge*, 382 Ill. App. 3d at 733; *Viking*, 358 Ill. App. 3d at 36; *Wil-Freds*, 277 Ill. App. 3d at 699. In that context, the answer turns on whether the complaint for which the CGL insurer is asked to defend alleges damage to property that is not any part of the construction project. *CMK Development*, 395 Ill. App. 3d at 840; *Stoneridge*, 382 Ill. App. 3d at 753; *Viking*, 358 Ill. App. 3d at 55-56; *Wil-Freds*, 277 Ill. App. 3d at 705-06.

¶ 31     In our view, the duty to defend Denk & Roche turns on a slightly different question: what qualifies as damage beyond "the project itself" and therefore as an occurrence and property damage, where the insured is a subcontractor performing discrete work on a project and that subcontractor has no control over or contractual obligation regarding other aspects of the project? The parties offer quite different answers to this question.

¶ 32     Cincinnati argues that the Belgravia complaint "stated contribution/construction negligence causes of action against Denk & Roche, *** whose work allegedly caused or contributed to the conditions and defects on and within the building envelope." And these issues, as alleged in the Association complaint, "interfered with the habitation and usage of the common elements and individual condominium units in the building," and thus alleged an occurrence causing property damage under the policy. Cincinnati relies heavily on our decision in *Larsen*, 2011 IL App (1st) 101316, arguing it is "factually analogous, directly on point, and determinative of the argument."

¶ 33     In that case, Larsen was hired as a subcontractor to apply window sealant to windows installed by another contractor. *Id.* ¶ 3. The windows subsequently leaked, causing water damage to "condominium common elements, individual units and unit owners' personal property." *Id.* ¶¶ 3, 20. We held that this complaint alleged "not merely construction defects, which would constitute economic losses not covered under the CGL policy" but, rather, damage to other

property. *Id.* ¶ 21. The damage alleged was not limited to that damage "merely associated with the repair or replacement of the faulty window caulking and sealant." *Id.* The damage alleged was "imputed to Larsen through his negligent workmanship [and] included personal property and water damage *throughout a building not constructed by Larsen*." (Emphasis added.) *Id.* ¶ 28. Relying on *Viking*, 358 Ill. App. 3d at 37, and *Richard Marker*, 289 Ill. App. 3d at 822, we held that damage to other materials not furnished by the insured constituted both "property damage" and an "occurrence," triggering coverage under a CGL policy.

¶ 34 Acuity offers a bevy of cases in which Illinois courts have held that damages that are the "natural and ordinary consequence" of poor workmanship cannot be an accident, and therefore not an occurrence under a CGL policy, and that the costs to repair defective work are economic losses that cannot constitute property damage. See, *e.g.*, *Stoneridge*, 382 Ill. App. 3d at 753; *Viking*, 358 Ill. App. 3d at 56; *Wil-Freds*, 277 Ill. App. 3d at 706; *Indiana Insurance Co. v. Hydra Corp.*, 245 Ill. App. 3d 926, 930 (1993). As stated above, these cases involved allegations against either a developer, a general contractor supervising construction, or a sole contractor performing the only work at a given construction site. They do not address the issue here, where a subcontractor's allegedly poor workmanship caused damage to the overall project and individual condo units within the building—damage that went beyond the scope of its own work.

¶ 35 Acuity attempts to distinguish *Larsen* by arguing it "is nothing more than a case where damage to something other than the building the insured worked on triggered coverage." In Acuity's reading, "the presence of damage to the condominium owners' personal property was the controlling fact in triggering the duty to defend," and no such allegations of "other property" damage are alleged in the Association or Belgravia complaints against Denk & Roche.

¶ 36 We agree that, in *Larsen*, the allegation of damage to condominium owners' personal

11

property was part of the basis of our holding. *Id.* ¶¶ 20, 21, 28. However, in *Larsen*, we viewed the damage to "*common elements*, individual units and personal property" as "property damage" that could trigger coverage under the CGL policy. (Emphasis added.) *Id.* The point we made there is that the allegation was more than one that "the window sealant and caulking were defective," and we treated all of the "property damage," whether to other aspects of the construction project or to the condominium owners' personal property, as a basis for finding coverage. *Id.*

¶ 37 Acuity emphasizes that it is completely foreseeable that a construction defect will cause damage to other elements of the construction project and that such natural and ordinary consequences of defective construction cannot be treated as an "occurrence" under a CGL policy. However, as we recognized in *Larsen*, while "there is no occurrence when a subcontractor's defective workmanship necessitates removing and repairing work" "[t]his court has repeatedly stated that damage to something other than the project itself does constitute an occurrence under a CGL policy." (Emphasis omitted and internal quotation marks omitted.) *Id.* ¶¶ 26-27. This damage to "something other than the project" included "water damage throughout a building not constructed by Larsen." *Id.* ¶¶ 27-28.

¶ 38 From the eyes of the subcontractor, the "project" is limited to the scope of its own work, and the precise nature of any damage that might occur to something outside of that scope is as unknown or unforeseeable as damage to something entirely outside of the construction project. The portions of the construction project that are completely outside the scope of the subcontractors' responsibility seem to us very similarly situated (from the subcontractors' point of view) to the "carpeting, drywall, antique furniture, clothing, personal mementoes and pictures," of unit owners, as to which we long ago recognized allegations of damage would

12

trigger a duty to defend. *Richard Marker*, 289 Ill. App. 3d at 820.

¶ 39 Although *Larsen* is the only Illinois subcontractor CGL coverage case of which we are aware, in two cases (not cited by the parties), federal courts applying Illinois law have also found coverage when an insured's poor workmanship caused damage to the project beyond the scope of the insured's own work. In *Ohio Casualty Insurance Co. v. Bazzi Construction Co.*, 815 F.2d 1146 (7th Cir. 1987), the United States Court of Appeals for the Seventh Circuit interpreted Illinois law to find that a CGL insurer owed its insured contractor a defense against allegations that the insured negligently poured concrete for the second floor of an existing structure, causing the joists to buckle and become dangerous. *Id.* at 1148. Relying on our supreme court's decision in *Brochu*, 105 Ill. 2d at 498, the court in *Bazzi* drew an important distinction about this construction project:

"Had Bazzi contracted to construct an entirely new building for [the owner], any damage to or defects in that building, which would be defined as the property or work product of Bazzi, would not be covered under the policy. But that is not the case now before us. Because the [owner's] complaint alleges damage to property *other than Bazzi's own work or product*, namely the structure of the existing garage, the district court properly concluded that the [underlying complaint] states a claim for property damage that is potentially within the coverage of the insurance policy." (Emphasis added.) *Bazzi*, 815 F.2d at 1148-49.

¶ 40 The United States District Court for the Northern District of Illinois, Eastern Division, came to a similar result in *Westfield Insurance Co. v. National Decorating Service, Inc.*, 147 F. Supp. 3d 708 (N.D. Ill. 2015), *aff'd*, 863 F.3d 690 (7th Cir. 2017), a case nearly identical in factual posture to this one. The court noted from the outset that it was an "unsettled" question in

Illinois whether there is "an 'occurrence' under standard-form [CGL] policies when the named insured contractor's faulty workmanship causes damage to a building that is beyond the scope of its own work there." *Id.* at 709. The condominium association for a 24-story building sued the general contractor (among others) in state court, alleging construction defects that caused damages such as cracking of concrete walls, leakage through exterior walls, defects to common elements, and damage to interior ceilings, floors, painting, drywall, and furniture in the units. *Id.* at 711. The general contractor filed a third-party complaint against subcontractor National Decorating, alleging its faulty workmanship damaged "the work of other trades on the project, specifically resulting in the peeling and cracking of drywall." (Internal quotation marks omitted.) *Id.* Westfield filed a declaratory action in federal court over whether it owed National Decorating a defense in the underlying action. *Id.* at 710.

¶ 41    The court in *National Decorating* construed the same CGL provisions at issue here and relied on both *Bazzi*, 815 F.2d 1146, and *Larsen*, 2011 IL App (1st) 101316, to find that Westfield owed the subcontractor a duty to defend. *National Decorating*, 147 F. Supp. 3d at 714-15. The court reasoned that "coverage depended on the scope of the subcontractor's work as the named insured." *Id.* at 715.

¶ 42    We recognize that there is at least one federal district court that has gone the other way, reading *Larsen* and other Illinois cases as holding that "[d]amage to a structure that results from its defective construction is" "not caused by an 'occurrence' within the meaning of a CGL policy, regardless of whether the insured contractor is responsible for all or just a portion of the building project." *Acuity v. Lenny Szarek, Inc.*, 128 F. Supp. 3d 1053, 1062 (N.D. Ill. 2015). However, we find the reasoning of *National Decorating* and *Bazzi* more persuasive on this issue.

¶ 43    We agree with these cases and *Larsen* that, when an underlying complaint alleges that a

subcontractor's negligence caused something to occur to a part of the construction project outside of the subcontractor's scope of work, this alleges an occurrence under this CGL policy language, notwithstanding that it would not be an occurrence from a general contractor or developer's perspective. *Larsen*, 2011 IL App (1st) 101316, ¶ 27.

¶ 44    Acuity also argues, in a footnote, that the holding in *Larsen* "is now suspect," given this court's more recent decision in *Westfield Insurance Co. v. West Van Buren, LLC*, 2016 IL App (1st) 140862, that allegations by a condominium association of damage even to unit owners' personal property do not trigger a duty to defend. While the analysis in *West Van Buren* differs somewhat from that in *Larsen*, *West Van Buren* does not address a subcontractor situation and is not directly on point here. In our view, the reasoning in *Larsen* is in keeping with the well-settled precedent on which it relied—namely, that when a complaint alleges an insured contractor's faulty workmanship caused damage to other property, there is a duty to defend. See *Larsen* 2011 IL App (1st) 101316, ¶ 27; *West Van Buren*, 2016 IL App (1st) 140862, ¶¶ 30-42 (Pucinski, J., dissenting). We follow that reasoning here and reverse the summary judgment ruling for Acuity.

¶ 45                              B. Equitable Contribution

¶ 46    Cincinnati argues that it was entitled to summary judgment on its claim for equitable contribution and the matter should have been set for prove-up regarding the exact amount of costs to be reimbursed. Acuity argues that, even if it did have a duty to defend Denk & Roche, Cincinnati would have no right to contribution in this case because their two policies could not cover the same risks where they applied to different coverage periods.

¶ 47    "Contribution as it pertains to insurance law is an equitable principle arising among coinsurers which permits one insurer who has paid the entire loss, or greater than its share of the loss, to be reimbursed from other insurers who are also liable for the same loss." *Home*

*Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 316 (2004). To recover under this theory, "the insurer seeking contribution must prove: (1) all facts necessary to the claimant's recovery against the insured; (2) the reasonableness of the amount paid to the insured; and (3) an identity between the policies as to parties and insurable interests and risks." *Schal Bovis, Inc. v. Casualty Insurance Co.*, 315 Ill. App. 3d 353, 362 (2000).

¶ 48    "Contribution applies to multiple, concurrent insurance situations and is only available where the concurrent policies insure the same entities, the same interests, and the same risks." *Home Insurance*, 213 Ill. 2d at 316. However,

> " '[i]t is not necessary that the policies provide identical coverage in all respects in order for the two policies to be considered concurrent, and each insurer entitled to contribution from the other; as long as the particular risk actually involved in the case is covered by both policies, the coverage is duplicate, and contribution will be allowed.' " *Schall Bovis*, 315 Ill. App. 3d at 363 (quoting 15 Couch on Insurance § 218:6 (3d ed. 1999)).

¶ 49    Cincinnati argues that it and Acuity "share an identity of risks" for purposes of equitable contribution, in that they "provided [CGL] insurance to Denk & Roche through primary policies issued for the period of January 2000 to June 2007 [from Cincinnati] and June 2007 to December 2012 [from Acuity]." Acuity responds that "the policies issued by Acuity and Cincinnati are not concurrent," but rather "are consecutive." It insists, without citation to authority, that consecutive policies cannot insure the "same risk" when the coverage period is a defined term in each policy and the two periods do not overlap.

¶ 50    The parties' dispute on the "concurrent policies" question largely focuses on this court's decision in *Continental Casualty Co. v. Security Insurance Co. of Hartford*, 279 Ill. App. 3d 815, 820 (1996). However, the holding in *Continental Casualty* did not turn on an analysis of the

coverage periods but, rather, on the fact that both policies were primary rather than excess insurance, and "as such, provided coverage to the insureds on the same basis." *Id.*

¶ 51    Insurance policies in Illinois need not temporally overlap in order to cover the same risk for purposes of equitable contribution. In *Liberty Mutual Insurance Co. v. Lumbermens Mutual Casualty Co.*, 525 F. Supp. 2d 993, 996 (N.D. Ill. 2007), the United States District court for the Northern District of Illinois, Eastern Division, construed settled Illinois law to find that class action allegations spanning consecutive, nonoverlapping policy periods nonetheless stated a claim for equitable contribution of defense costs. See also *Zurich Insurance Co. v. Raymark Industries, Inc.*, 145 Ill. App. 3d 175, 180, 197 (1986), *aff'd*, 118 Ill. 2d 23 (1987). Acuity has offered no authority for its claim that the policy periods must be identical or even overlap to cover the same risk.

¶ 52    We have ruled that the claims against Denk & Roche were within, or potentially within, Acuity's policy coverage, entitling the subcontractor to a defense from Acuity. Cincinnati is therefore entitled to equitable contribution from Acuity for undertaking the subcontractor's defense. The exact amount of contribution is a question for the trial court to answer in the first instance. We therefore remand for further proceedings consistent with this opinion.

¶ 53                                    IV. CONCLUSION

¶ 54    For the reasons stated in this opinion, we reverse the grant of summary judgment for Acuity, find that Acuity owed its insured Denk & Roche a duty to defend in the underlying construction litigation, and remand for further proceedings to allow Cincinnati to have a chance to prove-up the amount of contribution to which it is entitled.

¶ 55    Reversed and remanded.